## Bell Appeal.

594

Argued January 12, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and McBRIDE, JJ.

reargument refused July 22, 1959.

*David Stahl,* City Solicitor, with him *Charles N. Caputo,* Assistant City Solicitor, for City of Pittsburgh, appellant.

*T. Robert Brennan* and *Louis C. Glasso,* with them *Brennan and Brennan,* for appellees.

*Alan Miles Ruben,* Assistant to the City Solicitor, and *David Berger,* City Solicitor, for City of Philadelphia, under Rule 46.

OPINION BY MR. CHIEF JUSTICE JONES, July 2, 1959:

These cases were heard and disposed of together by the Superior Court and were brought here on allocatur for the purpose of considering whether the Superior Court had jurisdiction to review the proceedings in the County Court of Allegheny County which were conducted in that court pursuant to procedure statutorily

prescribed and which does not provide for an appeal from the County Court's final orders. See Sections 7 and 8 of the Act of August 10, 1951, P. L. 1189, 53 PS §§23537 and 23538. The question arises out of the following circumstances and the administrative and judicial proceedings taken in connection therewith.

Joseph Bell, George E. Tarr and William Killeen, the appellants in the Superior Court, were police officers of the City of Pittsburgh. As a result of a certain incident in which they had been participants in some capacity, each of them was charged with conduct unbecoming an officer. They were tried before a Police Trial Board in accordance with the procedure prescribed by the Act of 1951, supra, which is applicable to Second Class Cities. The Police Trial Board found the accused guilty of the charges against them and recommended their dismissal from the City's service. The recommendation was duly approved by the Mayor. The police officers thereupon severally appealed to the Civil Service Commission of the City from the respective orders of dismissal. The Commission, after hearing, affirmed the recommendations of the Police Trial Board, as approved by the Mayor. Each of the police officers then appealed from the action of the Civil Service Commission to the County Court of Allegheny County. See Act of September 29, 1951, P. L. 1654 (Sess. 1951-1952), 53 PS §604.

The County Court entered upon a hearing *de novo*, as it was required to do by Section 8 of the Act of 1951, supra. After full hearings, at which extensive testimony was taken, the court entered an order in the case of each of the appellants affirming, at their respective costs, the orders of dismissal recommended by the Police Trial Board as approved by the Mayor and as affirmed by the Civil Service Commission. By stipulation of counsel, all pertinent testimony in the *Killeen*

and *Bell* cases was admitted in evidence in the *Tarr* case. The court's discussion in its adjudication in the *Killeen* case of the reasons for its action, was, by express reference, made a part of the adjudication in the *Bell* and *Tarr* cases. From the orders so entered by the County Court, the dismissed policemen severally took the appeals to the Superior Court which, after argument thereon, filed an opinion applicable to all three appeals and entered the order (now here on allocatur) reversing the separate orders of the County Court with the same effect as though the charges had been dismissed in the lower court.

No question of a lack of jurisdiction in the Superior Court to entertain the appeals was raised in that court which concluded that the subject matter was before it on broad *certiorari* and proceeded to a disposition of the appeals on the merits. It is never too late to question a court's jurisdiction of the subject matter: *Fowler v. Eddy*, 110 Pa. 117, 1 A. 789; and, the lack of the Superior Court's jurisdiction in the premises is now directly before us, having been specifically raised by the City of Philadelphia in the *amicus curiae* brief which it has filed in this court under our Rule 46. It is settled beyond question that jurisdiction of subject-matter cannot be acquired by a court either through consent, waiver or estoppel of the parties: *Patterson's Estate*, 341 Pa. 177, 180, 19 A. 2d 165; *Wolfe v. Lewisburg Trust & Safe Deposit Co.*, 305 Pa. 583, 588, 158 A. 567; *Blumenthal's Estate*, 227 Pa. 268, 272, 75 A. 1075.

Where appellate review of the action of a court of first instance or of an administrative tribunal is not provided for by statute or is expressly so denied, no right of appeal exists. But, even in such instance, appellate review of the proceedings below for certain purposes is obtainable in this court through an exercise

of our King's Bench powers under the Act of May 22, 1722, 1 Sm. L. 131, 140, Section XIII. As stated in *Carpentertown Coal & Coke Company v. Laird,* 360 Pa. 94, 99, 61 A. 2d 426, the Act of 1722, supra, "vested in the Supreme Court all the jurisdictions and powers of the three superior courts at Westminster, namely, the King's Bench, the Common Pleas and the Exchequer. Inherent in the Court of King's Bench was the power of general superintendency over inferior tribunals, a power which was of ancient inception and recognized by the common law from its very beginnings. Blackstone says, Book III, *42: 'The jurisdiction of this court [of King's Bench] is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below.' "

The Superior Court derives all of its jurisdiction and powers from statute. See *Duquesne City v. Fincke,* 269 Pa. 112, 115, 112 A. 130; *Commonwealth v. Long,* 276 Pa. 154, 156, 120 A. 125; *Commonwealth ex rel. v. Speer,* 267 Pa. 129, 134, 110 A. 268; cf. *Pittsburgh v. Pierce,* 69 Pa. Superior Ct. 520, 524. Hence, no right of appellate review exists in that court in any instance except it be expressly authorized by statute. Particularly significant is the fact that the Superior Court does not possess the powers of the Court of King's Bench. See *Delaware County National Bank v. Campbell,* 378 Pa. 311, 316, 106 A. 2d 416; cf. also, *Martonick v. Beattie,* 383 Pa. 168, 171, 117 A. 2d 715. No statute confers such powers upon the Superior Court except for the purely incidental right to issue a writ of mandamus or prohibition to a court of inferior jurisdiction ancillary to proceedings pending in the Superior Court under its appellate jurisdiction, *i.e.,* by appeal authorized by statute. See Act of May 21, 1941, P. L. 47, 17

PS §181, Pkt. Part. Even this restriction on the Superior Court's issuance of writs of mandamus and prohibition for purely ancillary use is further confirmation of the fact that the Superior Court does not possess the powers of King's Bench in general which include the power to issue common law writs of *certiorari*. It follows, therefore, that the Superior Court is without authority to review the work of an inferior tribunal as on *certiorari* where no right of appeal to that court is conferred by statute. *Walker's Appeal*, 294 Pa. 385, 388, 144 A. 288.

The *certiorari* which the Supreme Court employs to bring up the record of a proceeding in a court of first instance, where no right of appeal is statutorily authorized or is expressly prohibited, is not to be confused with the certiorari utilized by this court and the Superior Court for the purpose of bringing up for review the record in the court below when an authorized appeal has been taken. For uniformity, no doubt, the Superior Court adopted this court's appeal form for directing a lower court to send up for review the record, there pending, in an appealed case. Such form, called a certiorari, is but the means used for initiating appellate review in any instance and is not the common law writ of *certiorari* issued under the King's Bench powers which this court alone is authorized to exercise in this State. In fact, the Act of June 24, 1895, P. L. 212, which established the Superior Court, expressly provided that "No writ of certiorari shall be needed to remove the record to the Superior Court from the court below, but the perfecting of the appeal shall be treated as equivalent to the issue and execution of said writ."

The historical modes for bringing a matter before the Supreme Court for review, when this court was the only tribunal exercising appellate jurisdiction, were

writ of error, appeal and *certiorari.* See, *e.g., Lessee of M'Clemmons v. Graham,* 3 Binney 88 (1810); *Commonwealth v. Beaumont,* 4 Rawle 366 (1834); *Baker v. Williamson,* 2 Pa. 116 (1845).[1] These three separate methods for obtaining appellate court review were recognized and carried forward in the Constitution of 1874, by Article V, Section 3, which provided that the judges of the Supreme Court "shall have appellate ju-

---

[1] For an authoritative and concise exposition of the purpose and scope of the several methods of review by the Supreme Court in use in this State, see *Rand v. King,* 134 Pa. 641, 645, 19 A. 806, where it was said that "[The mode] most generally employed was the writ of error, which lay against any final judgment in any court of record, and against such interlocutory and auxiliary orders as have been made reviewable upon it by statute. On this writ the judgment is reviewed with reference to alleged errors which are pointed out by exceptions taken to the action of the trial court at the time when the rulings are made, and as a general rule the power of the Supreme Court is limited to the questions so raised: Warsaw Tp. Poor D. v. Knox Tp. Poor D., 107 Pa. 301. In all equity cases, and those following the equity forms, an appeal from the decree complained of is the proper mode of review. It brings up the pleadings and the evidence on which the decree rests, and makes it necessary for the appellate court to examine, and see whether the decision is just and conscionable on the case that was presented to the chancellor who made it. The remaining method was by writ of certiorari. This writ brought up the record in any given case for review and correction, but it brought the record only: Carlson's License, 127 Pa. 330; Holland v. White, 120 Pa. 228. The errors to be corrected must appear on the face of the record: Chase v. Miller, 41 Pa. 403; and the merits cannot be inquired into upon this writ, but are left to the judgment of the court below: Election Cases, 65 Pa. 20. Neither the opinion of the court, nor the evidence, forms any part of the record proper, and for that reason they will not be examined on certiorari: Holland v. White, supra. The character of the proceeding to be reviewed, suggested, therefore, the method to be adopted, and the limits within which the practitioner should direct his preparation."

The scope of review on *certiorari* was enlarged to some extent by the Act of April 18, 1919, P.L. 72, as will hereinafter appear.

risdiction by appeal, certiorari or writ of error in all cases, as is now or may hereafter be provided by law."

The Act of May 9, 1889, P. L. 158, 12 PS §1131, subsequently prescribed that "All appellate proceedings in the supreme court heretofore taken by writ of error, appeal or certiorari, shall hereafter be taken in a proceeding to be called an appeal." All that that Act did was to apply a single name to the three separate and distinct writs for invoking the Supreme Court's appellate jurisdiction. It did not in any way obliterate the characteristics of the several writs or the scope of appellate review afforded by each. In *Rand v. King,* 134 Pa. 641, 645-646, 19 A. 806, it was early recognized that "Since the Act of 1889, these modes [of review] remain applicable in the same cases, within the same limits, and with the same effect as before, the only difference being that now they are all called by the same name. . . . [The Act] simply provides that dissimilar proceedings shall be called by the same name. An appeal in name may therefore be a writ of error or a certiorari in legal effect, and it is necessary, in every case, to look into the record, and determine at the outset of our examination whether what is 'called an appeal' is such in fact, or is a writ of error or a certiorari." See also *Camp Hill Borough,* 142 Pa. 511, 516, 21 A. 978, and *Gates v. Pennsylvania R. R.,* 154 Pa. 566, 571, 26 A. 598, where the above quotation from *Rand v. King* was reiterated with approval. Any suggestion that the Act of 1889, by including the common law writ of *certiorari* within the term "appeal", had the subsequent effect of conferring upon the Superior Court jurisdiction to entertain an appeal on *certiorari,* where no appeal has been authorized, is patently fallacious and merits no further consideration.

Nor is appellate jurisdiction to review on *certiorari* (where no appeal from the action of the court below is

statutorily authorized) to be ascribed to the Superior Court on the ground that the Act of 1895, which established the Superior Court, provides in Section 7 that "The said court shall have . . . appellate jurisdiction . . . in the following classes of cases: . . . (e) Any case whatever, civil or criminal, at law or in equity or in the orphans' court, except felonious homicide, in which the parties or their attorneys file a stipulation in the proper court below at any stage of the proceedings agreeing that the case may be heard and decided by the Superior Court, although the case would otherwise have been *appealable* directly to the Supreme Court." (Emphasis supplied). Plainly enough, the provision, by its terms, is made applicable to "appealable" cases, and not to ones where no appeal is authorized. A contention that the above-quoted provision of the Act of 1895 was intended to approve a court's acquiring jurisdiction of subject matter by agreement of the parties is obviously untenable.

Section 7(e) of the Act of 1895 was manifestly designed to authorize the parties in cases *where both the Supreme and Superior Courts have coordinate jurisdiction of subject matter, e.g.,* in assumpsit, trespass, equity, etc., to choose the Superior Court's appellate jurisdiction regardless of any limitation thereon by way of amount in controversy or otherwise. The use in Section 7(e) of the word "criminal", in defining the type of cases to which its provision was to be applicable is superfluous and of no effect. That is plainly evident. The immediately preceding Sections 7(a) and (b) of the Act of 1895, supra, respectively conferred appellate jurisdiction on the Superior Court in proceedings in the court of quarter sessions and in the court of oyer and terminer except cases of felonious homicide. As a consequence, the Superior Court's jurisdiction of criminal appeals is so broad as to make

resort to Section 7(e), for selecting the appellate forum, useless.

The argument, to similar effect, based on the Act of May 5, 1899, P. L. 248, which amended the Superior Court Act of 1895, is equally without merit. Section 11 of the Act of 1899 provides that "Whenever an appeal is taken to the Superior Court, the appellee shall be held to have waived objection to the jurisdiction of that court, unless he file with the prothonotary thereof an objection on this ground, on or prior to the hearing of the appeal by the Superior Court. If the objection is made, the Superior Court shall hear and decide it speedily, and if it is sustained and the appeal is certified to the Supreme Court the prothonotary of the Superior Court shall, in addition to the appeal costs already paid, be paid by the appellant the sum of three dollars as further costs in the cause." Here, likewise, no additional jurisdiction of subject matter is created. The provision was intended to make available the jurisdiction of the Superior Court, if the parties so desired, only in instances where that court had jurisdiction of the subject matter but not of the particular cause owing to the restriction on its jurisdiction because of the amount in controversy.

The provisions of Section 7(e) of the Act of 1895 and of Section 11 of the Act of 1899 are conversely complimentary and are to be read *in pari materia*. Section 7(e) of the Act of 1895, as we have seen, confers jurisdiction on the Superior Court to entertain an appeal if the parties file a stipulation to that effect in the court below, while Section 11 of the Act of 1899 authenticates an appeal to the Superior Court if the appellee fails to file with the prothonotary of that court an objection to the jurisdiction. But, as we have already indicated, each of these provisions is applicable only to cases where the appeal is from a judgment, order or de-

cree relating to subject matter whereof both the Supreme and Superior Courts have coordinate jurisdiction. The decision in *Philadelphia County Election Board v. Rader,* 162 Pa. Superior Ct. 499, 505, 58 A. 2d 187, to other effect cannot rationally be sustained, as a moment's reflection will reveal.

The *Rader* case involved an appeal from a judgment of contempt entered by a court of common pleas against the defendant ". . . for refusing to answer questions propounded by the County Election Board of Philadelphia." The Superior Court expressly recognized that the ". . . appeal . . ., regardless of amount involved, was not within [its] jurisdiction . . .". Nevertheless, the court forthwith assumed jurisdiction on the basis of Section 11 of the Act of 1899, supra, saying, in that connection, that "This defect [want of jurisdiction in the Superior Court] was called to the attention of counsel at the bar of this Court, and appellee expressly waived objection to our jurisdiction. Accordingly, we have decided the appeal." In other words, a court, which concededly lacks jurisdiction of the subject matter, can go ahead and adjudicate the merits. The error of such a proposition is self-evident. Under the rationale of the *Rader* decision, a case involving the right to a public office, which is cognizable in the first instance in the court of quarter sessions and is, by Section 7(a) of the Act of 1895, made appealable to the Supreme Court, could be appealed to the Superior Court if the appellee failed to object to the jurisdiction. Again, a defendant convicted of murder in the first degree could take an appeal to the Superior Court and, unless the district attorney filed with the prothonotary objection to the jurisdiction of the court, the prosecuting attorney would be held to have waived his objection to the jurisdiction and the Superior Court would proceed to hear and decide the matter although Section

7(b) of the Act of 1895 expressly provides that cases of felonious homicide shall be appealed directly to the Supreme Court.

The Act of May 8, 1956, P. L. 1540, furnishes a further illustration of the error of the *Rader* decision. By that Act, the jurisdiction of the Superior Court to entertain appeals from decrees of the orphans' court, was repealed absolutely and, yet, according to the construction placed on the Act of 1899 by the *Rader* case, supra, appeals in orphans' court cases could still be taken to the Superior Court if the appellees failed to object to the jurisdiction of that court. The same would be equally true where the parties stipulate, under Section 7(e) of the Act of 1895, as to the appellate jurisdiction to be invoked, unless that provision be held applicable only when the Superior Court has jurisdiction of the subject matter but is prevented from exercising it because of the amount in controversy. The error of the jurisdictional ruling in *Philadelphia County Election Board v. Rader,* supra, is patent. Henceforth that decision must be considered as overruled.

The only way in which jurisdiction can properly be conferred upon the Superior Court to review the work of an inferior tribunal, where no appeal has been statutorily provided, is for the Legislature to authorize the Superior Court to entertain appeals in such cases. That is precisely what was done when the Legislature authorized an appeal to the Superior Court from an order of a court of common pleas or the County Court of Allegheny County in cases involving the suspension of a driver's license. See Section 1 of the Act of May 29, 1956, P. L. (1955) 1850, 75 PS §193, Pkt. Part. Theretofore, such cases were reviewed by this court on *certiorari.* Legislation was also the competent and efficient means whereby appeals to the Superior Court were authorized from orders of the courts of quarter

sessions or the County Court of Allegheny County refusing the issuance, renewals or transfers of liquor licenses (see Section 464 of the Act of April 12, 1951, P. L. 90, 47 PS §4-464) or from like court orders revoking or suspending such licenses: Section 471 of the Act of 1951, supra, 47 PS §4-471.

In most election cases, appeals beyond the common pleas court are not provided for. Hence, appellate review of such proceedings is by this court on *certiorari* under our King's Bench powers. See *Martonick v. Beattie,* 383 Pa. 168, 170, 117 A. 2d 715. The appeal in the *Martonick* case had been mistakenly taken to the Superior Court which heard it on the merits and entered an order. We brought the case here on allocatur, vacated the Superior Court's order for lack of jurisdiction and disposed of the appeal on the merits. As pointed out in *Martonick v. Beattie,* supra, there are but two instances where appeals from purely factual and incidental determinations in election matters by a court of common pleas are made, by statute, promptly appealable to the Superior Court. See Section 1611 of the Election Code of June 3, 1937, P. L. 1333, 25 PS §3231, and Act of July 28, 1941, P. L. 526, 25 PS §2936. This necessary legislative authorization of appellate jurisdiction further serves to point up the fact that the Superior Court lacks authority to review the proceedings of inferior tribunals where appeals have not been authorized.

The Act of March 2, 1923, P. L. 3, 17 PS §187, which conferred on the Superior Court jurisdiction of appeals from orders, judgments, or sentences of the County Court of Allegheny County or the Municipal Court of Philadelphia, did no more than designate the appropriate forum for such appeals. It did not confer the King's Bench power of common law *certiorari* on the Superior Court. That court continues, therefore, to be

without authority to review proceedings in the County Court of Allegheny County or the Municipal Court of Philadelphia on *certiorari* where no appeal is authorized by statute. Cf. *Walker's Appeal,* supra, at p. 388.

Nor is the fact that instances are to be found where the Superior Court entertained appeals, as if on *certiorari,* when no appeal was authorized, to be taken as support for a jurisdiction which the Superior Court does not possess. Most of such instances were concerned with orders of courts of quarter sessions on appeals thereto from orders of the Pennsylvania Liquor Control Board in license cases, such, for example, as *McGettigan's Liquor License Case,* 131 Pa. Superior Ct. 280, 200 A. 213. Assumption of jurisdiction in those cases cannot properly be used to support a jurisdiction in the Superior Court which does not exist. Section 404 of the Pennsylvania Liquor Control Act of November 29, 1933, Sp. Sess., P. L. 15, as amended by the Acts of July 18, 1935, P. L. 1246, and June 16, 1937, P. L. 1762, authorized appeals from the orders of the Liquor Control Board to the courts of quarter sessions of the various counties of the State, but expressly provided that, "There shall be no further appeal." In view of this inhibition, such an order of a court of quarter sessions could be reviewed only by this court on *certiorari* under our King's Bench powers. The Superior Court, conceding the limitation on its power to review the quarter sessions' orders on *certiorari,* dismissed the appeals in the *McGettigan Case.* That case is, therefore, non-decisional as to what the Superior Court's jurisdiction to review would have been had the Liquor Control Act been silent with respect to an appeal from the order of the court of quarter sessions. True enough, there are dicta in the opinion for the Superior Court which imply that, in such circumstances, that court would have reviewed the proceedings on the merits. But that

does not make for jurisdiction on *certiorari*. The Superior Court's appellate jurisdiction in liquor license cases has been properly clarified. As already indicated, the Act of April 12, 1951, P. L. 90, supra, made such orders of the courts of quarter sessions and the County Court of Allegheny County in Liquor Control Board cases directly appealable to the Superior Court.

To summarize: Where a right of appeal from the action of a lower court is not authorized by statute, or is expressly denied, or the statute provides that the action of the court below shall be final, appellate review of the proceeding can be had only on a writ of *certiorari*. Authority to issue such a writ is reposed in the Supreme Court by the Act of May 22, 1722, which conferred upon it the powers of the Court of King's Bench. The Superior Court is not clothed with such powers and is, therefore, without jurisdiction to review the proceedings of a lower court on *certiorari*. The Superior Court's appellate jurisdiction rests exclusively in direct appeal to it when expressly authorized by statute. It necessarily follows that the Superior Court erred in entertaining the appeals in the instant cases. Its order of reversal must therefore be vacated for want of jurisdiction just as was done in the case of *Martonick v. Beattie,* supra. That leaves the appeals before us for our disposition on *certiorari*.

Appellate review of the proceedings of an inferior tribunal by writ of *certiorari* was originally limited to an inspection of the record for jurisdiction below and correction of errors appearing on the face of the record. Neither the opinion of the court nor the evidence in the case formed any part of the record and the merits could not be inquired into on *certiorari*. The scope of the writ has since been somewhat enlarged. As recognized in *Rimer's Contested Election,* 316 Pa. 342, 350, 175 A. 544, ". . . by the year 1919 this court had considerably

expanded the original conception of the review to be accorded cases which came before it by writ of certiorari. In that year the General Assembly passed an act which made possible even further departures from the old rule." The Act referred to is the Act of April 18, 1919, P. L. 72, which provides that "in any proceedings heretofore or hereafter had in any court of record of this Commonwealth where the testimony has been or shall be taken by witnesses, depositions, or otherwise, and where an appeal has been or shall hereafter be taken from the order, sentence, decree, or judgment, entered in said proceedings, to the Superior or Supreme Court, such testimony shall be filed in said proceedings, and the effect of said appeal shall be to remove, for the consideration of the appellate court, the testimony taken in the court from which the appeal is taken, and the same shall be reviewed by the appellate court as a part of the record, with like effect as upon an appeal from a judgment entered upon the verdict of a jury in an action at law, and the appeal so taken shall not have the effect only of a certiorari to review the regularity of the proceedings in the court below."

While the Act of 1919, supra, enabled us, by an examination of the testimony on *certiorari,* to see whether the findings of the court below were supported by evidence, it was indicated in *Twenty-First Senatorial District Nomination,* 281 Pa. 273, 279, 126 A. 566, that the Act could not operate to expand our jurisdiction in cases where the statute particularly states that no appeal shall be permitted. It was there said that, "Where, in a statutory proceeding, the legislature fails to provide for an appeal . . ., a certiorari to inspect the record, in the broadest sense allowed by our cases, may, nevertheless, issue; but where the legislature . . . states that no appeal shall be permitted, then review, beyond determining questions of jurisdiction, cannot be had;

and, under circumstances such as those at bar, a certiorari for the latter purpose cannot be broadened into something more extensive, either by our prior rulings on the general subject in hand, or by operation of the Act of April 18, 1919, P. L. 72."

Thus, there was developed by judicial decision the two classifications of the common law writ of *certiorari* which this court has ever since recognized. See *Kaufman Construction Company v. Holcomb*, 357 Pa. 514, 517, 55 A. 2d 534, where, after quoting from *Twenty-First Senatorial District Nomination*, supra, we said, pp. 518-519, "The distinction thus made has been reiterated and reinforced in a multitude of subsequent cases holding that where a statute expressly provides that there shall be no appeal the scope of appellate review is limited to the question of jurisdiction and the regularity of the proceedings; the merits of the controversy cannot be considered even though the interpretation given to the facts or the law by the governmental agency or the court below may have been erroneous. [Footnote citing many cases] It is only where the statute is silent on the question of appeal that a review by certiorari may be had 'in the broadest sense' and the court may consider the record, including the testimony, to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made. [Footnote citing many cases]"

As the Act of August 10, 1951, supra, under which the proceeding in the County Court was conducted does not provide for an appeal from the action of that court, the records now before us are here on broad *certiorari*. We therefore look beyond jurisdiction of the court below and regularity of the proceedings to determine, by examining the testimony, whether the findings are supported by evidence or whether the court was guilty of

an abuse of discretion in such connection or an error of law. The scope of our review on *certiorari* does not contemplate our weighing the evidence and thereby arriving at independent findings. In *Walker's Appeal,* 294 Pa. 385, 389, 144 A. 288, we said, in speaking of the review on *certiorari,* when the testimony is a part of the record by virtue of the Act of 1919,—"Even thereunder we cannot weigh conflicting evidence further than to determine whether the decree appealed from is supported by any evidence and whether the court or judge had jurisdiction or authority to do the act complained of." Or, as said in *Rimer's Contested Election,* supra, (pp. 351-352), "it is our duty under the Act of 1919, P. L. 72, to examine the testimony to see if the findings of the trial court are supported by adequate evidence. *We will not, however, weigh the evidence nor in other respects substitute our discretion for that of the court below,* although, upon facts definitely ascertained, we will correct conclusions of law erroneously made." (Emphasis supplied). See also, *Healey's Appeal,* 319 Pa. 510, 512, 181 A. 786. The expressions "any evidence" or "adequate evidence", as used in the *Walker* and *Rimer* cases, supra, mean evidence which, if believed by the authorized fact finder, supports the findings. Whether the findings are so supported in no way depends on how we might have viewed the credibility or weight of the testimony had it been our province to act as the fact finder.

The charge of conduct unbecoming an officer, whereof each of the appellants was found guilty and for which he was dismissed from the police force of the City of Pittsburgh, grew out of one and the same episode. The credible testimony, as expressly so designated by the court below, established that Tony Grosso, a well known numbers racketeer with a long police record, was arrested by Officer Killeen in the early morn-

ing of July 3, 1957, in the vicinity of the Diamond Market in downtown Pittsburgh. A cab driver and a pedestrian witnessed Killeen administer a beating to Grosso. Officer Tarr and Lieutenant Bell were at the scene of the arrest. Grosso was booked on the police blotter as "Joseph Morro" and was given a hearing that same morning under the alias. Grosso was well known to Tarr, and Killeen and Bell were aware of Grosso's true identity, having admitted to Chester Harris, a newspaper reporter, that they knew the day of the hearing that "Joseph Morro" was in reality Tony Grosso. The charge against the officers was concealment of the identity of an arrested person and of persisting in the deception without taking steps to have it corrected.

Whether the officers were guilty of the charges against them depends on the credibility of the witnesses. The trial judge, who saw and heard the witnesses, expressly accredited Harris, the reporter, whose testimony established the case against the police officers. Thus, with respect to Harris, the trial judge in his adjudication states that he was impressed by Harris's testimony and that he appeared to be an honest and disinterested witness. On the other hand, the court discredited the testimony of the accused. As to Killeen, the court found that "he was untruthful to his superiors, and, again, in testifying before this Court" and that "he was instrumental with other officers in concealing the identity of Tony Grosso when the latter was charged with disorderly conduct." The court found that, although Tarr was present at the time Killeen arrested Grosso, he "told his superior officers that he was not present at the time of the arrest"; that he "knew that Tony Grosso had been booked under an assumed name"; and that he "made no effort to cause Grosso's correct name to be entered on the police records." The court further found that "As Acting Lieu-

tenant, Bell was charged with the responsibility of making sure that the accused was booked under his proper name"; that "Grosso was . . . charged at the scene of the arrest and later on at the police station under an assumed name"; and that "Acting Lieutenant Bell well knew this and yet participated in concealing the accused's identity."

If, in this welter of conflicting oral testimony, we should assume to weigh the evidence and, in the end, come out with findings opposite to that of the court below, we would be doing no more thereby than substituting our discretion for that of the trial court. Such, however, is not our prerogative on appellate review, especially on *certiorari*. It was the primary duty of the lower court to find the material facts and to render a decision accordingly, and we may not rightly interfere with the result unless the court below in its findings was guilty of a palpable abuse of discretion or an error of law. That, we cannot considerately say was the case in the present instance.

Although on appeal to the County Court of Allegheny County under the Act of 1951, supra, as amended (applicable to Second Class Cities) from an order of the Civil Service Commission of the City of Pittsburgh, the proceeding is *de novo,* the court does not have an absolute discretion to exercise in adjudging the merit and validity of the Civil Service Commission's order. It is necessary that the court give due respect and weight to the action of the duly constituted municipal body which is authorized to act with respect to charges against members of the City's police force. In *Ditko Appeal,* 385 Pa. 435, 436, 123 A. 2d 718, which involved the dismissal of a policeman, under the Third Class City Act, for conduct unbecoming an officer, the court of common pleas of Berks County affirmed the order of dismissal by the city council which, under the Third

Class City Act, occupies the position of the Civil Service Commission under the Act applicable to Second Class Cities. We affirmed expressly on the opinion of the court below (reported 5 Pa. D. & C. 2d 569), and thereby approved, inter alia, the following (pp. 576-577) : "In spite of the fact that the matter is before us de novo, the court should not lightly set aside an order of dismissal rendered at the hands of a duly-elected and constituted body of public officials [there the City Council] who are charged with conducting the affairs of the police department and maintaining necessary discipline so as to assure the functioning of the vital protection of an efficient police force." Likewise, in *Caldwell v. Fairley*, 363 Pa. 213, 215, 69 A. 2d 135, where we again affirmed on the opinion of the court below, which, after quoting from *Thomas v. Connell*, 264 Pa. 242, 246, 107 A. 691, to the effect that "What constitutes ample cause for removal within the limits fixed by the act must necessarily be largely a matter of discretion on the part of the head of the department" added, "This is especially true of the police service where a semimilitary discipline is to be encouraged and greater strictness of enforcement and severity of punishment is to be permitted."

The record in the cases before us does not disclose that the court below was guilty of an abuse of discretion or that it committed an error of law. The statutorily prescribed procedure was strictly pursued and the accused officers were accorded procedural due process in full measure.

The orders entered by the Superior Court at Numbers 109, 110 and 111 April Term 1958 of that court are hereby vacated and set aside.

The separate appeals from the several orders of the County Court of Allegheny County are dismissed.

Mr. JUSTICE BELL concurs in the opinion for the court on the question of appellate review on *certiorari*. He would reverse, however, on the merits for a palpable abuse of discretion on the part of the trial court.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I concur in the opinion of the Court on the question of appellate review on certiorari.

I dissent, however, from the Majority's conclusions on the merits of the case. I believe the facts do not warrant the conclusion reached by the County Court. In any event it is simply inescapable that the penalties imposed against the three policemen in this case are unreasonable to the point of unfairness and cruelty.

Here are three men who have devoted their respective lives to the profession of police officers; they are trained for this type of work and none other. Now, because of a mistake in judgment, assuming that the County Court was correct in its conclusions, (which of course I do not concede), they are dismissed, dishonored and deprived of their livelihood. It is a contemplation which is harrowing and should disturb anyone devoted to the cause of justice and fairness, as we know justice and fairness in America.

In the first place, the County Court of Allegheny County should never have approved the findings of the Trial Board and the Civil Service Commission. In hearing the case, the County Court completely failed to perform its duty. It was required to hear evidence and consider the case de novo. *De novo* assumes that for the purpose of the hearing there has been no previous proceeding. When a Court takes up a cause *de novo,* it has the responsibility of hearing evidence, weighing

it, and reaching conclusions as if this had been the first time the involved litigants had ever appeared before a tribunal.[1] The County Court did not seem to understand this. It stated: "In the appeals under consideration this Court has limited its decision to decide whether or not there was substantial evidence to sustain the action of the Civil Service Commission and the administration in dismissing these police officers, *even though the Court may have arrived at a different conclusion if it were making an independent inquiry.*"[2]

This is a broad hint that if the County Court had been sitting as a Trial Board, it would not have reached the conclusions it announced. But the County Court was sitting as a Trial Court to determine the facts. It was doing, or should have been doing, what it said it did not have the power to do. It *did* have the power to make an independent inquiry, and, in fact, went through the motions of an independent inquiry, but then when it came to a formal adjudication, it put on self-forged chains, and contented itself with an affirmance of what went on before.

This misconception of its powers, or at least its failure to exercise them, entitles the policemen to a new hearing, and I would, therefore, reverse the action of the County Court and send the cause back for a rehearing.

In seeking to justify its action the County Court cited the case of *Thomas v. Connell*, 264 Pa. 242, where this Court said: "What constitutes ample (just) cause for removal must necessarily be largely a matter of discretion on the part of the head of the department. To be sufficient, however, the cause should be personal to the employee and such as to render him unfit for

---

[1] *American Fruit Growers v. Runzo*, 95 F. Supp. 842.

[2] Italics throughout, mine.

the position he occupies, thus making his dismissal justifiable and for the good of the service." But in that case the discharged official had been found guilty of insubordination and of using profane and contemptuous language toward the Mayor of Scranton, his superior. Our Court properly said: "Insubordination and disrespect toward a superior, whose duty it is to see that the work of his department is carried on in a proper manner, are matters which, if permitted to pass unpunished, tend to demoralize the public service, and lead to general inefficiency and disloyalty among employees."

There was nothing like that in the case of the three men involved in these proceedings. The record shows them to have been good police officers; they have been respectful to their superiors; they have been efficient and loyal. William Killeen became a policeman on January 19, 1940 (not 1950 as incorrectly stated by the County Court.) Joseph Bell got his badge on January 7, 1929. George E. Tarr has been on the police force since December 19, 1941. Thus, these officers rendered faithful service for 17½ years, 28 years, and 16 years, respectively. In all those years they have never been insubordinate, they have never flinched from danger, they have never failed to measure up to what is expected of a good police officer. In all that time they have upheld law and order; they have bestowed protection on the weak, the aged, and the helpless; they have given assistance to everyone who turned to them for help; they have never brought shame or dishonor to the uniform they wore.

These three men have upheld the dignity and the respect which goes with an officer of the law. A policeman is a soldier of peace, he is the symbol of an orderly community. When the tranquillity in that community is disturbed, when violence threatens, when accidents

spill their cargoes of pain and confusion, it is the policeman who works and battles to bring back normalcy and harmony, it is the policeman who summons medical care and mechanical aid, it is the policeman who restores confidence and well-being to the distraught neighborhood.

These three men have been worthy of the tributes which society happily bestows on guardians of the peace. Up until July 3, 1957, their records were unblemished, their names unstained, their reputations as law-abiding and home-loving citizens excellent. On July 3, 1957, they erred, that is if we accept at face value the findings of the Trial Board, the affirmation of the Civil Service Commission, and the unsatisfactory review by the County Court. But, assuming that, in the performance of their duty, they missed the chalked line, did they go so far that their marginal misstep should condemn them to decapitation? Was it that kind of a blunder which warrants taking away their uniform which they have worn so long without a single brass button tarnished? My answer is an emphatic negative.

Another deplorable sequel to the penalty inflicted in this case, if unrectified, is that it will extend beyond punishing the men themselves. The punishment will work a demoralizing effect on the whole police force. Every policeman will feel that a sword of Damocles hangs over his head as he walks his beat and as he responds to a call to action. A policeman's weapons are not limited to revolver and mace. He must also carry the side arms of daring, initiative, and aggressive resourcefulness if he is to successfully fight bandits, burglars, thieves, and other malfeasors of the underworld who are formidably equipped and trained to wage their ungodly war against society. If the law rivets to the policeman's ankle an iron ball of threatening chas-

tisement always ready to trip him in the event he makes an unforeseeable error, he is to that extent disarmed in his battle against the criminal. If he is held back in that fashion his zeal is bound to suffer, his ardor can only diminish—all to the advantage of the violent evildoers ever ready to pounce on a defenceless society.

Of course, a policeman is amenable to the law like everybody else if he transgresses the legal code. But no one has charged that these men committed a criminal offense or that they performed any deed involving moral turpitude. Taking the evidence in its worst possible light they were negligent and possibly indifferent to the necessity of getting the right name of a man they arrested and who later was released on a ten dollars forfeit.*

Assuming that the findings of the Trial Board were substantiated by evidence, a reprimand or a short suspension would not have been out of order. But to drive the appellants out of the only profession they know, take away their unsullied badges, and visit calamity on their families is a punishment which cannot, in justice, be supported by facts or law.

Of what use is it to preach vigilance, virtue and rectitude if, with one little slip, a man's lifelong record of vigilance, virtue and rectitude is ignored and he is pushed over the cliff of ignominy and disaster? We are not a vengeful people. We are dedicated to goodness, right, and probity of conduct, but it is written in the pages of man that to err is human; and, when the error is not motivated by an evil spirit, we stand ready to give the erring mortal another chance. That is America, that is civilization, that is Christendom. If tolerance,

---

* Officer Killeen perhaps went further than duty required when he struck the motorist who approached him for guidance and assistance.

moderation, charity, humanity, and mercy are part of the American way of life, and they undoubtedly are, this is the time and the place to exercise those attributes.

If the County Court had exercised the authority it possesses, it would, at the very least, in accordance with the law, have reduced the punishment imposed by the Trial Board. If this Court had exercised the authority which it indubitably possesses, it would have struck down this penalty which is completely out of accord with the law as written in the books and in the hearts of men. But, since the County Court and this Court have failed to discharge what I regard as their obvious responsibility, I trust that the City of Pittsburgh will reinstate Officers William Killeen, Joseph Bell and George E. Tarr to their places. For whatever error they may have committed, they have long since made retribution in salary lost and anguish suffered.

William Schwenk Gilbert said: "The policeman's lot is not a happy one." But there is no reason why that unhappiness should be added to by the forces of the very law, to uphold which the policeman fears no storm or darkness, flinches from no danger or menace, fights against visible and invisible foe, and stands ready, at any time, if necessary, to give his life. The cumulative dangers and hardships which these three men of the law have sustained over a collective incumbency of 61 years entitle them to a showing of kindness which they have undoubtedly often displayed toward others, in entire keeping with the majesty of the law and the dignity of man, which, all combined, make America the land of true and understanding justice.

DISSENTING OPINION BY MR. JUSTICE McBRIDE:

This decision, in one fell swoop, reverses a whole course of procedure which is fully justified by law, has been approved by this Court and followed by the Superior Court since its creation. Between 1895 and 1919 the Superior Court reviewed a host of cases on narrow certiorari. Between 1919 and the present time that court reviewed the same types of cases on broad certiorari. Now this Court holds they never should have done it at all.

The Act of August 10, 1951, P. L. 1189, 53 P.S. §23537, et seq., provides that in any city of the second class no policeman "shall be removed, discharged or suspended for a period exceeding ten days as a penalty, or reduced in rank or pay without his written consent, except for just cause, which shall not be religious or political; . . .". After departmental procedures have been satisfied and the Mayor has approved a discharge, the accused policeman has the right, within ten days of such notice, to appeal to the civil service commission. If the civil service commission sustains the decision the accused has the right to appeal by petition to the court of common pleas.[1] The duty of the court is to "hear the charges made against the accused de novo. . . . The court shall fix a time and place for hearing, shall make findings of fact and conclusions of law, and file a decision. The issue before the court shall be whether the action of the trial court [police] shall be affirmed or modified in any respect or whether the charges should be dismissed." No further appeal to any court is authorized or forbidden.

In the present case charges were made by their superiors against Joseph Bell, George E. Tarr, and Wil-

---

[1] The County Court of Allegheny County was given jurisdiction by §1(m) of the Act of July 6, 1951, P.L. 994, 17 P.S. §626, and by the Act of September 29, 1951, P.L. 1654, 53 PS §604.

liam Killeen, policemen of the City of Pittsburgh, that each had been guilty of conduct unbecoming an officer. Each of the three policemen was given a hearing before a police trial board which recommended dismissal. This action was approved by the Mayor of the City of Pittsburgh and the officers were dismissed.

Upon appeal to the civil service commission the. dismissals were affirmed. The policemen then took appeals to the County Court of Allegheny County which heard the cases *de novo,* made findings of fact and conclusions of law and held that ample cause for the dismissals existed. The policemen then filed appeals to the Superior Court. No contention was made by the City that the Superior Court lacked jurisdiction to hear such an appeal. The Superior Court reversed the orders of the County Court in all three cases, President Judge RHODES dissenting from the decision reversing the dismissals of Tarr and Killeen. The City then petitioned for allowance of appeal which this Court granted.

By "analogy" to the powers of the Supreme Court, the Superior Court asserted jurisdiction in this case on the basis of a power of "broad certiorari" with which it found itself invested.

Under the Act of May 22, 1722, 1 Sm. L. 131, §13, establishing courts of judicature in the province of Pennsylvania, the Supreme Court was given the power to "exercise the jurisdictions and powers" [granted by the act] "as fully and amply, to all intents and purposes whatsoever, as the Justices of the Court of King's Bench, Common Pleas, and Exchequer, at Westminster, or any of them, may or can do." The power of King's Bench was exercised in criminal cases on the crown side of the court and in civil cases on the plea side of the court. *Commonwealth v. Balph,* 111 Pa. 365, 376, 3 A. 220.

By Act of June 16, 1836, P. L. 784, §1, 17 P.S. §41, the legislature confirmed our power ". . . to minister justice to all persons, in all matters, whatsoever, as fully and amply, to all intents and purposes, as the said court has heretofore had power to do, under the constitution and laws of this commonwealth; . . . ."

Then, by Article 5, §3, of the Constitution of 1874, it was provided that this Court "shall have appellate jurisdiction by appeal, certiorari or writ of error in all cases, as is now or may hereafter be provided by law." Those three separate forms of review were utilized to meet various types of proceedings and it was essential that litigants select from among them the appropriate mode of review.

We said in *Rand v. King*, 134 Pa. 641, 645, 19 A. 806: "That most generally employed was the writ of error, which lay against any final judgment in any court of record, and against such interlocutory and auxiliary orders as have been made reviewable upon it by statute. On this writ the judgment is reviewed with reference to alleged errors which are pointed out by exceptions taken to the action of the trial court at the time when the rulings are made, and as a general rule the power of the Supreme Court is limited to the questions so raised: Warsaw Tp. Poor D. v. Knox Tp. Poor D., 107 Pa. 301. In all equity cases, and those following the equity forms, an appeal from the decree complained of is the proper mode of review. It brings up the pleadings and the evidence on which the decree rests, and makes it necessary for the appellate court to examine, and see whether the decision is just and conscionable on the case that was presented to the chancellor who made it. The remaining method was by writ of certiorari. This writ brought up the record in any given case for review and correction, but it brought the record only: Carlson's License, 127 Pa.

330; Holland v. White, 120 Pa. 228. The errors to be corrected must appear on the face of the record: Chase v. Miller, 41 Pa. 403; and the merits cannot be inquired into upon this writ, but are left to the judgment of the court below: Election Cases, 65 Pa. 20. Neither the opinion of the court, nor the evidence, forms any part of the record proper, and for that reason they will not be examined on certiorari: Holland v. White, supra. The character of the proceeding to be reviewed, suggested, therefore, the method to be adopted, and the limits within which the practitioner should direct his preparation."

Thereafter, by Act of May 9, 1889, P.L. 158, 12 P.S. 1131, the legislature provided "All appellate proceedings in the Supreme Court heretofore taken by writ of error, appeal or certiorari, shall hereafter be taken in a proceeding to be called an appeal." This did not mean, however, that review by writ of error or certiorari was thereby abolished; it simply meant that the appropriate one or more of these three dissimilar modes of review could be had, under a procedure called an appeal. *Rand v. King,* 134 Pa. 641, 19 A. 806; *Camp Hill Borough,* 142 Pa. 511, 21 A. 978; *Commonwealth v. Tragle,* 4 Pa. Superior Ct. 159. The majority opinion says, "Any suggestion that the Act of 1889, by including the common law writ of *certiorari* within the term 'appeal', had the subsequent effect of conferring upon the Superior Court jurisdiction to entertain an appeal on *certiorari,* where no appeal has been authorized, is patently fallacious and merits no further consideration." To the best of my knowledge, no such suggestion has been made by anybody and is certainly not being made in this dissenting opinion.

This was the status of appellate review when the Superior Court was created. By the Act of June 24, 1895, P.L. 212, §7, 17 P.S. §181, the legislature pro-

vided that the Superior Court "shall have exclusive and final appellate jurisdiction of all appeals which are now allowed to the Supreme Court in the following classes of cases: . . ." Under this act, and its amendments and supplements, the classes of cases enumerated are:

(1) Proceedings of any kind in the Court of Quarter Sessions of the Peace or before any judge thereof except in cases involving the right to public office. (17 P.S. §182)

(2) Proceedings of any kind in the Court of Oyer and Terminer and General Jail Delivery except cases of felonious homicide. (17 P.S. §183).

(3) Appeals from the Court of Common Pleas in any case at law or in equity if the subject of the controversy be either money, chattels, real or personal, or the possession of or title to real property if the amount in controversy be no greater than $5,000 or if the action be not brought, authorized or defended by the Attorney General in his official capacity. (17 P.S. §184).

(4) Appeals in proceedings in divorce and general appeals by labor claimants under the Act of 1897. (17 P.S. §186)

(5) Appeals from any order, judgment or sentence of the County Court of Allegheny County or the Municipal Court of Philadelphia or of any similar court hereafter created where by law it is not provided that such appeal be taken to the Court of Common Pleas or Quarter Sessions of the Peace. It was further provided that such orders, judgments or sentences are not appealable to the Supreme Court except upon allowance as in the case of other orders, judgments and sentences of the Superior Court. (17 P.S. §187)

(6) Appeals in Habeas Corpus cases involving custody of children. (12 P.S. §1874)

The legislature, when it gave to the Superior Court in 1895, exclusive and final appellate jurisdiction of all "appeals" which were there allowed to the Supreme Court in the enumerated classes of cases, did not mean thereby to exclude review by it on writ of error or certiorari. In view of the fact that in 1889 the legislature preserved review in all three specified modes, by using the word "appeal" to cover all of them, there is no reason to believe it intended any different meaning to be attached to the word "appeals" when it used it six years later in 1895. I believe that where the legislature specifically provides for an appeal in any case falling in any of the specifically enumerated classes provided for by the Act of 1895, as amended, the Superior Court may afford appropriate review whether it be by writ of error, appeal or certiorari, in the same way as this Court previously had jurisdiction to do. However, the Act of August 10, 1951, P.L. 1189, 53 P.S. §23537, et seq., under which the present proceeding was brought, as noted above, neither authorizes nor forbids any appeal from the County Court and although under the Act of March 2, 1923, P.L. 3, §1, 17 P.S. §187, a review of all [2] appealable proceedings of the County Court of Allegheny County is given to the Superior Court no right of appeal is thereby given in any particular case. It follows that the Superior Court could not review this case either by appeal in its strict sense or by writ of error and it has not sought to do so.

The scope of appellate review by the common law writ of certiorari has been a fruitful source of controversy both in this Court and in the Superior Court.

---

[2] This is different from the right of the Superior Court to review the proceedings of Common Pleas Court. In the latter case, review is limited to controversies as to "money, chattels, real or personal, or the possession of or title to real property if the amount in controversy be no greater than $5,000."

As pointed out by us in *Kaufman Construction Co. v. Holcomb,* 357 Pa. 514, 55 A. 2d 534, there has been much vacillation in the cases. Since its creation the Superior Court from 1895 until 1919, held itself powerless to review even by narrow certiorari where the statute provided that the action of the lower court was final or conclusive or that there could be no further appeal.[3] That court, during the same period, consistently reviewed by narrow certiorari to the extent of passing upon the jurisdiction of the inferior court and the regularity of its proceedings in cases where the applicable statute neither authorized nor forbade appellate review.[4] Such review covered many types of cases.

---

[3] Appeals quashed or dismissed by the Superior Court between 1895 and 1919 where appellate review is specifically denied by statute: *Schwenker & Co. v. Wagner,* 71 Pa. Superior Ct. 573 (1919) ; *Miller v. Metropolitan Life Ins. Co.,* 58 Pa. Superior Ct. 464 (1914) ; *Home Protective Assoc. v. Reese,* 47 Pa. Superior Ct. 452 (1911) ; *Huntington & Broad Top Mountain R.R. v. Fluke,* 32 Pa. Superior Ct. 126 (1906) ; *Adams v. Berge,* 30 Pa. Superior Ct. 422 (1906) ; *Fry v. Spatz,* 29 Pa. Superior Ct. 592 (1905) ; *Minogue v. Ashland Borough,* 27 Pa. Superior Ct. 506 (1905) ; *Phoenix Iron Works Co. v. Mullen,* 25 Pa. Superior Ct. 547 (1904) ; *Alexander & Co. v. Goldstein,* 13 Pa. Superior Ct. 518 (1900) ; *Crumley v. Crescent Coal Co.,* 13 Pa. Superior Ct. 231 (1900) ; *Carroll v. Barnes & Erb Co.,* 11 Pa. Superior Ct. 590 (1899) ; *Colwyn v. Tarbotton,* 1 Pa. Superior Ct. 179 (1896).

[4] Cases reviewed by the Superior Court on "narrow" certiorari between 1895 and 1919 where appeal is neither authorized nor forbidden by statute: *Holly v. Travis,* 71 Pa. Superior Ct. 527 (1919) (KELLER, J.) ; *Allegheny County Commissioners' Case,* 61 Pa. Superior Ct. 591 (1915) (KEPHART, J.) ; *Sinking Spring Borough,* 52 Pa. Superior Ct. 481 (1913) (HENDERSON, J.) ; *Com. v. Layton,* 45 Pa. Superior Ct. 582 (1911) (RICE, P.J.) ; *Star Brewing Co.'s License,* 43 Pa. Superior Ct. 577 (1910) (HEAD, J.) ; *Com. v. Brownell,* 35 Pa. Superior Ct. 249 (1908) (RICE, P.J.) ; *Mack v. Schuylkill Trust,* 33 Pa. Superior Ct. 128 (1907) (PORTER, J.) ; *Franklin Township's Election Districts,* 29 Pa. Superior Ct. 534

628

Indeed, in *Commonwealth v. Gibbons*, 9 Pa. Superior Ct. 527, the Superior Court reviewed a commitment of a Quarter Sessions Court for criminal contempt. Its jurisdiction to do so was specifically questioned. In an able discussion the court held that it had statutory power to review by certiorari even though an appeal in cases of criminal contempt is not specifically authorized. This Court entertained an appeal which is reported *sub nom Kelly's Contested Election*, 200 Pa. 430, 50 A. 248. The Superior Court was affirmed without discussion of the scope of review allowed to that court. It is obvious that had this Court been of opinion that the Superior Court lacked the jurisdiction asserted on the face of its opinion we would have vacated its order and then independently passed upon the judgment of the Quarter Sessions Court as the majority now does today. Thus it is seen that for twenty-four years the Superior Court, without attempted correction by this Court, consistently exercised the right to review the orders of inferior courts by *narrow certiorari*. And then, by the Act of April 18, 1919, P.L. 72, 12 P.S. §1165, the legislature for the

---

(1905) (RICE, P.J.) ; *Waynesburg Borough's Election Districts*, 29 Pa. Superior Ct. 534 (1905) (RICE, P.J.) ; *Welsh's Appeal*, 22 Pa. Superior Ct. 392 (1903) (PORTER, J.) ; *West Donegal Township Rd.*, 21 Pa. Superior Ct. 620 (1902) (Per Curiam) ; *Road in Herrick & Ararat Townships*, 16 Pa. Superior Ct. 579 (1901) (SMITH, J.) ; *Nobles v. Piollet*, 16 Pa. Superior Ct. 386 (1901) (RICE, P.J.) ; *Huntingdon County Line*, 14 Pa. Superior Ct. 571 (1900) (RICE, P.J.) ; *Miller v. Summers*, 13 Pa. Superior Ct. 127 (1900) (ORLADY, J.) ; *In the Matter of a Private Road in Dennison Township, Luzerne County*, 13 Pa. Superior Ct. 227 (1900) (RICE, P.J.) ; *Com. v. Gibbons*, 9 Pa. Superior Ct. 527 (1899) (SMITH, J.) ; *In re Division of Wards of the City of Pittsburgh into Election Districts, Appeal of W. S. Guffey, et al.*, 7 Pa. Superior Ct. 478 (1898) (Per Curiam) ; *Com. v. Solomon Fogelman and Harris Flomenhaft*, 3 Pa. Superior Ct. 566 (1897) (RICE, P.J.).

first time created in any appellate court the right to review by what is now called *broad certiorari.*[5]

Whatever doubt may have existed prior to that statute ought to have been dispelled. This is the very act invoked by this Court in the assertion of its own power to review by broad certiorari. Without it we would have no such right. No serious contention can be made that the specific inclusion of the Superior Court along with this Court was meaningless. Presumably the legislature had full knowledge of the consistent position taken by the Superior Court since its creation in the cases cited in this opinion. The need was felt that both appellate courts should not be restricted to "certiorari to review the regularity of the proceedings in the court below". Where an appeal is specifically allowed all three modes of review are open. Therefore this enlarged scope of review obviously was intended to apply in the class of cases where appeals were neither authorized nor forbidden, otherwise there would have been no reason to provide that the testimony would be considered "with like effect as upon an appeal from a judgment entered upon the verdict of a

---

[5] The Act in its entirety reads as follows: "Be it enacted, &c., That in any proceedings heretofore or hereafter had in any court of record of this Commonwealth where the testimony has been or shall be taken by witnesses, depositions, or otherwise, and where an appeal has been or shall hereafter be taken from the order, sentence, decree, or judgment, entered in said proceedings, to the *Superior or Supreme Court*, such testimony shall be filed in said proceedings, and the effect of said appeal shall be to remove, for the consideration of the appellate court, the testimony taken in the court from which the appeal is taken, and the same shall be reviewed by the appellate court as a part of the record, with like effect as upon an appeal from a judgment entered upon the verdict of a jury in an action at law, and *the appeal so taken shall not have the effect only of a certiorari to review the regularity of the proceedings in the court below.*" (Emphasis supplied)

jury in an action at law . . .". Since the Act of 1919 both this Court and the Superior Court [6] have reviewed by broad certiorari cases within their respective competence where the statute neither authorizes nor forbids an appeal. It is to be noted that these cases are not all liquor license cases as the majority opinion indicates. Rather, they include public road cases, township annexation cases, appeals from justices, criminal contempts, zoning cases, proceedings of the Courts of Quarter Sessions and proceedings in the Municipal Court of Philadelphia and the County Court of Allegheny County. But in this Court and also in the Superior Court there has been much vacillation as to the right of the latter court since 1919 to review by narrow certiorari where the legislature has denied an appeal or provided that the judgment of the inferior tribunal is final or conclusive. The position of this Court as to

---

[6] Cases reviewed by the Superior Court on broad certiorari since 1919 where appellate review is neither authorized nor forbidden by statute: *Jehovah's Witnesses Appeal*, 183 Pa. Superior Ct. 219 (1957) (ERVIN, J.) ; *Hazle Twp. Annexation Case*, 183 Pa. Superior Ct. 212 (1957) (ERVIN, J.) ; *Com. v. Jakub*, 182 Pa. Superior Ct. 418 (1956) (WRIGHT, J.) ; *Culbertson Appeal*, 182 Pa. Superior Ct. 374 (1956) (Per Curiam) ; *Schaub Appeal*, 180 Pa. Superior Ct. 105 (1955) (ERVIN, J.) ; *Com. v. Richardson*, 174 Pa. Superior Ct. 171 (1953) (RENO, J.) ; *Lerten Appeal*, 168 Pa. Superior Ct. 516 (1951) (GUNTHER, J.) ; *Diana Adoption Case*, 165 Pa. Superior Ct. 12 (1949) (RENO, J.) ; *Middlecreek Township Road Case*, 162 Pa. Superior Ct. 619 (1948) (ARNOLD, J.) ; *Polis v. Raphael*, 160 Pa. Superior Ct. 544 (1947) (HIRT, J.) ; *Likar Appeal*, 157 Pa. Superior Ct. 572 (1945) (RHODES, J.) ; *Roming v. Shivers*, 156 Pa. Superior Ct. 205 (1944) (JAMES, J.) ; *Lynch v. Hickey*, 152 Pa. Superior Ct. 129 (1943) (RHODES, J.) ; *Pacewicz Liquor License Case*, 152 Pa. Superior Ct. 123 (1943) (KELLER, P.J.) ; *Martin's Grill Inc. Liquor License Case*, 149 Pa. Superior Ct. 185 (1942) (KELLER, J.) ; *Braddock Township Appeal*, 148 Pa. Superior Ct. 52 (1942) (RHODES, J.) ; *Wood v. Industrial H., A. & L. Ins. Co.*, 107 Pa. Superior Ct. 338 (1932) (STADTFELD, J.).

its own jurisdiction has been perfectly clear, at least since *Kaufman Construction Co. v. Holcomb*, 357 Pa. 514, 55 A. 2d 534; but the Superior Court has in a number of cases taken the incorrect position that it may review on narrow certiorari even where the legislature has denied all appellate review.[7] In some of the cases we have approved this practice by refusal of allocatur.[8] The Superior Court has gone even farther, and in a number of cases has reviewed on broad certiorari where the legislature has provided that the decision of the lower court shall be final or conclusive, thereby denying all appellate review.[9] Again this

---

[7] Cases reviewed by the Superior Court on narrow certiorari since 1919 where appellate review is specifically denied by statute: *Penn Wynne v. Lower Merion Township*, 181 Pa. Superior Ct. 524 (1956) ; *Wynnewood Civic Assn. v. Lower Merion Township*, 180 Pa. Superior Ct. 453 (1956) ; *Boyle Appeal*, 179 Pa. Superior Ct. 318 (1955) ; *Plum Township Annexation Case*, 178 Pa. Superior Ct. 376 (1955) ; *Saxony Construction Co. Appeal*, 178 Pa. Superior Ct. 132 (1955) ; *Pittston Debt Funding Case*, 172 Pa. Superior Ct. 55 (1952) ; *Blair Liquor License Case*, 158 Pa. Superior Ct. 365 (1946) ; *Kimmell Liquor License Case*, 157 Pa. Superior Ct. 59 (1945) ; *Shaheen's Liquor License Case*, 145 Pa. Superior Ct. 5 (1941) ; *Lithuanian Benef. Assoc's Club Liquor License Case*, 142 Pa. Superior Ct. 556 (1940) ; *Kester's Appeal*, 140 Pa. Superior Ct. 293 (1941) ; *Spankard's Liquor License Case*, 138 Pa. Superior Ct. 251 (1940) ; *McGettigan's Liquor License Case*, 131 Pa. Superior Ct. 280 (1938).

[8] *Boyle Appeal*, 179 Pa. Superior Ct. 318, allocatur refused 179 Pa. Superior Ct. xxvi (1955) ; *Saxony Construction Co. Appeal*, 178 Pa. Superior Ct. 132, allocatur refused 178 Pa. Superior Ct. xxviii (1955) ; *Plum Township Annexation Case*, 178 Pa. Superior Ct. 376, allocatur refused 178 Pa. Superior xxix (1955). Refusal of allocatur by this Court has been treated by the Bench and Bar to import an approval on the merits of the case unlike the denial of certiorari by the Supreme Court of the United States.

[9] Cases reviewed by the Superior Court on broad certiorari since 1919 where appellate review is specifically denied by statute: *Lemoyne Borough Annexation Case*, 176 Pa. Superior Ct. 38 (1954) ;

Court has approved this situation by refusal of allocatur.[10]

Since the Superior Court was created purely by statute it has no power whatever to review in any way the jurisdiction of inferior tribunals where the legislature has denied an appeal.[11] It is true that the word "appeal", when granted by statute, is of uncertain meaning in that it is still necessary that the appellate court adopt the appropriate method, that is, writ of error, appeal or certiorari (*Commonwealth v. Fisher*, 184 Pa. Superior Ct. 75, 80, 132 A. 2d 739), nevertheless, when the legislature denies the right of appeal, it excludes all review by the Superior Court by all three methods of review and all review by this Court save only our right to review by narrow certiorari. The Superior Court has correctly so held in: *Perroni v. Thornberry*, 173 Pa. Superior Ct. 647, 98 A. 2d 641 (1953); *Shaffer v. Sires*, 81 Pa. Superior Ct. 589 (1923); *Widener v. Schwartz*, 74 Pa. Superior Ct. 294 (1920).

---

*Salisbury Township Annexation Case*, 172 Pa. Superior Ct. 262 (1953); *Ontelaunee Township Annexation Case*, 172 Pa. Superior ,Ct. 71 (1952); *Dallas Borough Annexation Case*, 169 Pa. Superior Ct. 129 (1951); *Derry Township School Dist. Appeal*, 168 Pa. Superior Ct. 415 (1951); *Irwin Borough Annexation Case (No. 1)*, 165 Pa. Superior Ct. 119 (1949); *Warner Bros. Theatres, Inc. v. Pottstown Borough*, 164 Pa. Superior Ct. 91 (1949); *Revocation of Mark's License*, 115 Pa. Superior Ct. 256 (1934); *Appeal of Bender*, 106 Pa. Superior Ct. 376 (1932).

[10] *Dallas Borough Annexation Case*, 169 Pa. Superior Ct. 129, allocatur refused 169 Pa. Superior Ct. xxvi (1951); *Derry Township School District Appeal*, 168 Pa. Superior Ct. 415, allocatur refused 168 Pa. Superior Ct. xxiv (1951); *Appeal of Bender*, 106 Pa. Superior Ct. 376, allocatur refused 106 Pa. Superior Ct. xxv (1932).

[11] I concur with the majority's disapproval of any case holding that the Superior Court can review on narrow or broad certiorari where appellate review is specifically denied by statute.

The distinction between the Superior Court and this Court, in this connection, is that we may review by narrow certiorari even where the legislature has provided that no further appeal beyond that of the trial court may be had.[12] This is so because this Court alone of the courts of this Commonwealth has the power to bring the records of inferior judicial tribunals before us for review under our revisory powers of King's Bench. *Delaware County Natl. Bank v. Campbell,* 378 Pa. 311, 316, 106 A. 2d 416 (1954); *Apex Hosiery Co. v. Philadelphia County,* 331 Pa. 177, 200 Atl. 598 (1938); *Schmuck v. Hartman,* 222 Pa. 190, 70 Atl. 1091 (1908). The legislature may enlarge the power of this Court (*Apex Hosiery Co. v. Philadelphia County,* 331 Pa. 177, 200 Atl. 598) as it did by the Act of 1919 (broad certiorari) but it may not take away our revisory power so far as it extends to an inquiry (narrow certiorari) into the asserted jurisdiction of any inferior tribunal or the regularity of its proceedings. *Grime v. Dept. of Public Instruction,* 324 Pa. 371, 188 Atl. 337; *Rimer's Contested Election: Appeal of Gearey,* 316 Pa. 342, 175 Atl. 544; *Clarke's Appeal,* 301 Pa. 321, 152 Atl. 92; *White Township School Director's Appeal,* 300 Pa. 422, 425-6, 150 Atl. 744; *Walker's Appeal,* 294 Pa. 385, 144 Atl. 288; *Twenty-first Senatorial District Nomination,* 281 Pa. 273, 126 Atl. 566. Since the governing statute in this case neither forbade nor authorized review and the class of cases is one which falls within the specifically enumerated appellate court power of the Superior Court, that court was fully justified in entertaining this appeal by the method of broad certiorari. In other words, it had the right,

---

[12] This is true no matter how unequivocal the legislative mandate purports to be. Sometimes the statute says "no appeal shall be allowed" or that the order or decision of the court shall be "final" or "final and conclusive".

in addition to reviewing the jurisdiction of the County Court and the regularity of its proceedings, to consider the record, including the testimony as well as the findings and the opinion to determine whether the findings were supported by competent evidence and to correct any conclusions of law erroneously made.

When this appeal was taken to the Superior Court no objection to its jurisdiction was filed prior to the hearing of the appeal. However, it is never too late to question the jurisdiction of a court over the subject matter of the litigation. *Fowler v. Eddy*, 110 Pa. 117, 1 Atl. 789 (1885).

Nothing is better settled than the proposition that jurisdiction over the subject matter cannot be conferred by consent, waiver or estoppel. *Patterson's Estate*, 341 Pa. 177, 180, 19 A. 2d 165; *Wolfe v. Lewisburg Trust and Safe Deposit Co.*, 305 Pa. 583, 158 A. 567; *Blumenthal's Estate*, 227 Pa. 268, 75 A. 1075. It follows that unless the legislature gave appellate jurisdiction of the subject matter of this controversy to the Superior Court, a purely statutory court, it was not reviewable there. See *Commonwealth v. Long*, 276 Pa. 154, 120 A. 125; *Commonwealth v. Speer*, 267 Pa. 129, 110 A. 268; *Pittsburgh v. Pierce*, 69 Pa. Superior Ct. 520.

In creating the Superior Court the legislature provided by §7(e) of the Act of June 24, 1895, P.L. 212, 17 P.S. §189, that in addition to the *specifically* enumerated cases the Superior Court had appellate jurisdiction of the *subject matter* of: "Any case whatever, civil or criminal, at law or in equity or in the orphans' court, except felonious homicide, in which the parties or their attorneys file a stipulation in the proper court below at any stage of the proceedings agreeing that the case may be heard and decided by the Superior Court, although the case would otherwise have

been appealable directly to the supreme court." No such stipulation was filed in this case. The legislature later provided by §11 of the Act of May 5, 1899, P.L. 248, 17 P.S. §203: "Whenever an appeal is taken to the superior court, the appellee shall be held to have waived objection to the jurisdiction of that court, unless he file with the prothonotary thereof an objection on this ground, on or prior to the hearing of the appeal by the superior court. If the objection is made, the superior court shall hear and decide it speedily, and if it is sustained and the appeal is certified to the supreme court the prothonotary of the superior court shall, in addition to the appeal costs already paid, be paid by the appellant the sum of three dollars as further costs in the cause."

When the parties in the present case participated in a hearing of the appeal by the Superior Court, they perfected the *statutory jurisdiction* of that court and although they are not now too late to question the jurisdiction their position must be determined in the light of that fact. I would conclude that in addition to the appellate powers of the Superior Court specifically enumerated it also has jurisdiction over the subject matter of any case appealable to us and not specifically forbidden to it, providing there be either a stipulation filed under the Act of 1895 or a waiver under the Act of 1899. *In such cases it is the legislature which has conferred the jurisdiction, not merely the stipulation or the waiver.*[13] These provisions were obviously inserted into the law with the deliberate pur-

---

[13] Workmen's Compensation is an example of the same sort of jurisdiction. Despite the fact that the statute is authorized by constitutional amendment the Board has jurisdiction *of the subject matter* only if both Employer and Employee have waived their right to trial by jury. See *Anderson v. Carnegie Steel Co.*, 255 Pa. 33, 39, 99 Atl. 215.

pose of relieving this Court of some of the burden of its business and also to provide an appellate tribunal where the parties might possibly get a speedier disposition should they make the conscious choice of doing so. Therefore, although the Superior Court does not have the revisory powers of King's Bench, it does have jurisdiction *generally to hear all appeals* from the County Court of Allegheny County and it had jurisdiction to hear this particular appeal by "broad certiorari" since (1) no right of appeal is denied and (2) the City of Pittsburgh waived the right to object. I cannot see the slightest support for the conclusion in the majority opinion that these two sections apply only where a jurisdictional amount is involved.

In summary then, I believe that in any case in which an appeal is allowed, even though cognizable as of right only by the Supreme Court, the Superior Court (except where jurisdiction is specifically forbidden to it) [14] has jurisdiction to hear it if the parties file the stipulation provided for under the Act of 1895 or fail to object as stated in the Act of 1899. In addition thereto, it has cognizance of the subject matter of such appeals as are enumerated in the Act of 1895, as amended, regardless of the consent of the parties. In both instances, review in the nature of that formerly afforded by writ of error, appeal or certiorari is available, whichever is appropriate. Where appeal is neither authorized nor forbidden by common law or statute, the Superior Court may review on broad certiorari both the enumerated classes and all others with the consent of the parties. In all cases, whether specifically enumerated as falling within the appellate jurisdiction of the Superior Court or not, there may be no review by the Superior Court by any means

---

[14] Such as cases of felonious homicide. Section 7(e), Act of 1895, *supra*.

whatever where the statute provides that there shall be no appeal or that the decision of the inferior court shall be final. In such cases this Court may review on narrow certiorari.

Nothing said by us in *Martonick v. Beattie,* 383 Pa. 168, 117 A. 2d 715, contradicts this conclusion. In that case this Court granted an appeal from the decision of the Superior Court reported in 179 Pa. Superior Ct. 470, 118 A. 2d 594. That court had assumed appellate jurisdiction of an election case in the Common Pleas Court which the law confided to this Court. We vacated its decree and decided the merits of the controversy. The difference between that case and the present one is that the Superior Court has never had jurisdiction of appeals from the Common Pleas either at law or in equity except in relation to "money, chattels, real or personal, or the possession of or title to real property". Here, contrariwise, the Superior Court does have jurisdiction of the subject matter of *all* cases heard in the County Court where appellate review is appropriate. Besides, in the *Martonick* case, the Superior Court did not purport to act by virtue of its statutory jurisdiction under §7(e) of the Act of 1895, supra, or §11 of the Act of 1899, supra, and the force and effect of those provisions were not argued to this Court or considered in the opinion.

It may be contended that the result of this dissenting opinion would be that appeals from second class cities in civil service cases will go from the County Court to the Superior Court and from all other counties they will go from the Common Pleas to this Court. That is true. Such a situation, however, is infinitely preferable to one in which the Superior Court would be held powerless to review by broad certiorari the proceedings of the Courts of Quarter Sessions, including public road cases, liquor license cases, annexation

cases, appeals from justices, criminal contempts, and all proceedings in the Municipal Court of Philadelphia County and the County Court of Allegheny County which are not specifically made appealable. This Court should not assume such jurisdiction particularly since the Superior Court was given by statute exclusive jurisdiction in such matters and this Court may not review them directly from the nisi prius level, at least, "by any form of appeal or writ of error". Act of June 24, 1895, P.L. 212, §14, 17 P.S. §201. Under today's holding the Superior Court will have no right to review by certiorari. This Court will have to review by certiorari all the types of cases enumerated above. How can we hold that we alone may review by broad certiorari because of the Act of 1919, *supra,* which by its express terms includes the Superior Court as well?

Having allowed an appeal from the Superior Court I agree that we therefore review the entire proceeding in the County Court on broad certiorari not only to determine regularity and jurisdiction but also to examine the evidence and see whether, in the light of it, the Court abused its discretion or committed an error of law. Act of April 18, 1919, P.L. 72, 12 P.S. 1165; *Grime v. Department of Public Instruction,* 324 Pa. 371, 188 Atl. 337; *Kaufman Construction Co. v. Holcomb,* 357 Pa. 514, 55 A. 2d 534. I also dissent from the conclusion of the Majority on the "merits" of the case.

The gist of the complaint against these policemen is that each of them "intentionally or otherwise" withheld the true name of a man arrested for a minor offense. It is alleged that the true identity of such person "was known or should have been known" (not to any of the three but) "to an officer of the Bureau of Police". I would not rest my decision, however, upon the fact that this is a haphazardly drawn specification.

The intention is clear to charge conduct unbecoming an officer even though the specification, applying the standards of pleading in judicial actions, would be insufficient. Specifications in such cases need not be drawn in accordance with the same standards of care and specificity as are applied to indictments or civil procedures. *Caldwell v. Fairly*, 363 Pa. 213, 215, 69 A. 2d 135; *Shellenberger v. Warburton*, 279 Pa. 577, 124 Atl. 189.

From the record the following facts were given in evidence before the County Court:

In the early morning of July 3, 1957, William Killeen, a police officer employed by the City of Pittsburgh, with over seventeen years of service, was patrolling his beat, in uniform, on foot, in the downtown section of the city in the vicinity of the Diamond Market. He there encountered a man who excitedly told him that his automobile had been stolen and that he was trying to get a policeman to do something about recovering his car. It would appear that angry words were exchanged between the man and Killeen in which the man addressed Killeen by name, whereupon Killeen, without any apparent justification so far as the record discloses, assaulted the man and beat him severely with his night stick. Killeen then took the man to the police call box which was close by and called for a police wagon. About the time the patrol wagon arrived at the scene another police officer, George Tarr (with fifteen and a half years of service on the police force of the city) arrived and stood approximately twenty-five feet from the call box. In addition to the patrol wagon crew and some civilians who quickly gathered, Acting Lieutenant Joseph Bell (with twenty-eight years of experience on the police force of the city) arrived at the scene, got into the patrol wagon which then departed for the Allegheny General Hos-

pital so that medical attention could be given to the injured man. Prior to its departure, Killeen had advised the wagon men to "book" the man on a disorderly conduct charge. At the hospital, where the injured man was given first aid, he gave his name as Joseph Morro (as shown by the Aided case report). He gave the same name to the wagon officers. After he was treated the officers then took him to the desk sergeant at No. 1 police station where he was slated for disorderly conduct under the name he had given. This Aided case report was later signed by Bell, the acting lieutenant. The prisoner then, in accordance with the usual custom, posted a $10 cash bail to appear for a hearing in the morning. Killeen having gone about his duties in the meanwhile, appeared at the time fixed for the hearing. When the defendant did not appear his bond was directed to be forfeited by the magistrate and no hearing on the charge has ever been held. After the forfeiture Killeen was informed by someone at the police station that the man he had arrested was in reality Tony Grosso. On July 9, 1957, a newspaper reporter of the Pittsburgh Sun Telegraph, named Chester Harris, an experienced police reporter and rewrite man, received information from his night city editor that Tony Grosso, a numbers racketeer, had been beaten by patrolman *George Tarr* and he commenced an investigation.

As part of that investigation he talked first with Superintendent of Police Slusser, who had already been informed of the true identity of the arrested man. Harris thereafter talked with Killeen who admitted that he had struck Tony Grosso claiming, however, that he had the impression that Grosso was preparing to attack him and that he was justified in striking him with his fist. Although Harris testified that Grosso was reputed to be one of the biggest numbers racketeers

in Pittsburgh and was known to him as such for ten or fifteen years, he made it perfectly clear that Killeen, although he spoke of the man he arrested as Tony, did not say that he knew at the time he arrested him that his name was Tony or that it was Tony Grosso. Grosso, in fact, was a resident of a township in Allegheny County known as Mt. Lebanon Township and had not been arrested in Pittsburgh at least for a great number of years although he had been arrested in other places in Allegheny County and had used not only his real name, Tony Grosso, but also as aliases: Anthony Grassi and Joseph Russo. It would appear that Officer Foley, the driver of the patrol wagon, with fifteen years service; Officer Moceika, with ten years service; Sergeant Caplan, with eighteen years of service, the Acting Sergeant at the police desk at No. 1 Police Station, with eight years of service; and the Turnkey at No. 1 Police Station (otherwise unidentified) had not known the identity of the man at the time of the arrest.

### Killeen Case

The essential element of the case against Killeen rests on the court's finding that "Killeen was walking his beat in the vicinity of the Diamond Market. He there observed one Tony Grosso, a known gambler and numbers operator." But there is nothing in the testimony to show that at that time Killeen knew who Grosso was. There is no showing whatever that Grosso was known to anyone in that neighborhood, was himself familiar with it, or that he had spent any time around it or that there was any reason whatever for Killeen to know his identity. The court makes a finding of fact that "Grosso reported to Killeen that his car had been stolen. Words were exchanged between Killeen and Grosso and Killeen hit Grosso several times with his night stick". So far as this finding rests upon an assault committed by Killeen upon

Grosso it has no relevance whatever to the central question whether Killeen knew that it was Grosso whom he hit. It was well within the province of his superiors to have charged Killeen with an unjustified assault; but they did not do so. While it is true that specifications need not be drawn with the niceties applicable to criminal pleading, nevertheless, Killeen was entitled to "notice" of what it was he would be called to defend against. This was his statutory right. We cannot invoke this wholesome rule on behalf of all other citizens and deny it to policemen. This finding, therefore, as a separate ground for dismissal, must be wholly disregarded and under the record in this case has no probative value against him on the only specification that was made. The court's further finding was "Although Grosso was booked at the police station under the alias of 'Joseph Morro', Killeen never made any effort to have the incorrect booking changed". There was not even any evidence that at the time of arrest Killeen knew what name the man would give. Certainly, under the circumstances, the waiting patrol wagon and the desire to have him taken to a hospital for examination, it does not seem legally significant that he would insist on personally getting the name since he knew both the hospital and the patrol wagon crew would get it. The evidence is that he contented himself with merely stating the nature of the charges to be placed against the arrested man, that is, disorderly conduct. Besides, there is no evidence that Grosso would have given Killeen any other name than the one he gave at the hospital and to the patrol crew.

Thereafter, though he appeared at the hearing and was then informed that the defendant was in reality Tony Grosso, it has not been shown that he had any duty or indeed that he had any right to have the incorrect booking changed. He had not personally

booked the man and there is no suggestion that the custodian thereof was not in possession of the facts.

It is not clear on this record that it was until July 9 that Killeen knew with any reasonable certainty that the man who had been slated as Morro was actually Grosso; but at that time the Superintendent had the same information and so did the newspaper reporter. What conceivable point would there have been in Killeen having attempted to act at that late date?

The fifth finding of the court was "In conversations with his superiors concerning the incident, Killeen made untruthful statements". Certainly he made none to the Superintendent of Police because that official testified that he did not talk to Killeen or either of the others before the trial board hearing. There is no evidence of any questioning of Killeen prior to the hearing. As an independent finding of fact this was not included in the specifications which go to make up the charge of conduct unbecoming an officer and seems to find no support whatever in the record.

So that the court then, upon these preliminary findings, came to its ultimate conclusion that Killeen was guilty of conduct unbecoming an officer. In my opinion the evidence was insufficient to justify the findings made by the court. Furthermore, the court below misconceived its function. It said that the basic question involved in all three appeals is "Did the City have sufficient justification for its action in dismissing the officers and have just cause for said dismissals?" In other words, did the evidence taken before it justify the City's decision? That was not the question before the court. True it is that under the statute the issue before the court was whether the action of the police trial court (oddly enough not the Civil Service Commission) should be affirmed, modified or dismissed. But in coming to its conclusion the court was required,

under the law applicable to removal of policemen in second class cities, to review the case *de novo* and come to its own conclusion on the basis of the evidence without regard to whether its conclusions differed or accorded with that of the police trial court or the Civil Service Commission. Thus the court misapprehended the full scope of the Act of 1951. In this respect the law applicable to second class cities is different from that applicable to other municipalities. It is not for us to say why this is so or that if we so interpret it we will get more appeals. The majority opinion cites the opinion of the lower court in *Ditko's Appeal*, 5 Pa. D. & C. 2d 569, 576, affirmed by us per curiam 385 Pa. 435, in which it was said: "In spite of the fact that the matter is before us *de novo* the court should not lightly set aside an order of dismissal rendered at the hands of a duly-elected and constituted body of public officials who are charged with conducting the affairs of the police department and maintaining necessary discipline so as to assure the functioning of the vital protection of an efficient police force. . . ."

The *Ditko* case has no application to cities of the second class in which, by statute, the court not only hears the matter *de novo* but is specifically required to make findings of fact and state their conclusions of law. At most the *Ditko* case is not authority for the proposition that the court does not come to its own conclusion but only goes so far as to say that in doing so it may consider the finding of the administrative tribunal as being of some persuasive weight.

### Tarr Case

As to Tarr, there is evidence that he knew Grosso prior to the latter's arrest by Killeen. He had indeed known him for many years in connection with his police duties. There is no evidence, however, that Tarr knew that it was Grosso who was arrested by Killeen.

There is evidence that Tarr was present in the sense that he came along, stood about twenty-five feet away at the time Grosso was being put into the patrol wagon. Even if it be assumed, however, that he did know that Grosso was being arrested by Killeen there is no evidence that Tarr had any connection whatever with the case after that or knew that Grosso had given the false name "Morro" to the hospital, the wagon crew or to the desk sergeant. Since he did not participate in the arrest it was not his duty to be present on the following day and there is no evidence that it came to the attention of Tarr at any time prior to the investigation by the newspaper reporter, Harris, or the knowledge of the Superintendent of Police that Grosso had misstated his name to be "Morro". His own evidence that he was not present and the corroborating evidence that he was assigned to a special detail at another place may still be disregarded without leaving any evidence whatever that Tarr had anything to do with the misidentification of Grosso. The fifth finding that "George Tarr told his superior officers that he was not present at the time of the arrest" has not support in the record if it is meant to apply to an investigative phase of the matter since Tarr was not even interviewed. In any event, it is clearly not within the specification relied upon to support the charge.

### Bell Case

The findings against Bell generally incorporate the other findings against Tarr and Killeen. In addition, it must be noted the City called Bell for cross-examination and he denied that he knew that the man arrested was actually Tony Grosso at any time prior to being told by Harris, the newspaper man. The court apparently found Bell guilty because he had been on the police force for twenty-eight years and rode in the wagon along with Grosso and did not know his identity. It is true that if Bell knew it was Grosso then he could

not justify his signing of the record which showed that the prisoner was Morro. Although the County Court found that Bell knew Grosso's identity, I have searched the record in vain to find support for this statement, unless it be in the bland assumption that any policeman on a metropolitan police force for twenty-eight years knows each and every habitual law breaker at, in or near that community. At the scene of the arrest no name was given. There seems to be no evidence whatever that would charge Bell with knowledge as to the identity of Grosso at any time that would impose an affirmative duty upon him to do something about it.

These men could have been dismissed only for "just cause". The cause asserted against them was that each was guilty of conduct unbecoming an officer. The record is made up of assumptions, conjecture and suspicion; but not proof. I would conclude, therefore, that the findings of fact of the County Court are without adequate support in the record and, additionally, in reviewing the evidence it erred in failing to come to its own independent conclusion instead of resting decision on the proposition that the dismissal by the city was supported by sufficient evidence in the record.

I believe the Superior Court correctly decided this case and I would affirm its judgment reversing the decision of the County Court.