West Conshohocken Borough Appeal.

Argued April 21, 1961. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and EAGEN, JJ.

 reargument refused September 5, 1961.

*John Morgan Davis, Leonard A. Talone, Howard Richard, Robert W. Tredinnick,* and *Davis, Bellis & Kolsby,* and *Berman, Richard & Brian,* and *Smillie, Bean, Davis & Tredinnick,* for appellants.

*Desmond J. McTighe,* with him *E. Humes Garber,* and *Duffy, McTighe and McElhone,* for appellees.

*Daniel L. Quinlan, Jr.,* with him *Edward J. Ozorowski,* for appellees.

*Kesniel C. Acton* and *Alexander Ogle,* for Pennsylvania State Association of Boroughs, amicus curiae.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, July 17, 1961:

At issue herein is the attempted annexation by the Borough of West Conshohocken (Borough) of a 108 acre tract of land now part of Upper Merion Township (Township), both municipalities being located in Montgomery County.

The tract of land sought to be annexed—peninsular in shape and approximately 3700 feet long and 1200 feet wide—is bisected by the Schuylkill Expressway, a four lane limited access highway. To the east of the Expressway lie approximately 44 acres of the land sought to be annexed: this unimproved acreage adjoins the Borough, is owned practically in toto by Philadelphia Electric Company and, by reason of the Expressway, is inaccessible to and isolated from the rest of the land sought to be annexed.[1] To the west of the Expressway lies the balance—approximately 64 acres—of the land sought to be annexed. It consists of a wooded mountainous ridge, running generally north and south, entirely unimproved, except at its base, and is known as Rebel Hill. At its base are some private homes and property owned by Philadelphia Electric Company. The top of Rebel Hill—approximately 45½ acres—is owned by "The Easttown Co. and/or John S. Trinsey, Jr." (Trinsey).

---

[1] The annexation of this portion of the land appears meaningless to the Borough. The only suggested reason is that this portion of the land is *adjacent* to the Borough and, by its inclusion in the annexation proceedings, it can be claimed that the entire tract is *adjacent* to the Borough.

It is obvious from the record that the real motive behind this attempted annexation is to afford Trinsey an opportunity to develop the top of Rebel Hill into a self-contained community—four 20 story apartment buildings, a hotel, an office building and a heliport. Although no definite plans for such development appear of record and no assurance is given the Borough that the development will be completed, it is a fact that Trinsey's approach to the Borough to annex Rebel Hill was made after the Township had refused to rezone this area—an R-2 Residential district—so as to permit this development.[2]

On January 28, 1960, ten freeholders—a majority of the freeholders in the area—petitioned the Borough council for annexation of the area. A copy of that petition was served on the Township. On February 4, 1960 the first and second reading of the Borough ordinance of annexation took place and on February 10, 1960, after a third reading, the ordinance was passed by the unanimous vote of the councilmen then present. On February 22, 1960—at a special council meeting— the burgess of the Borough expressed his intent to veto the ordinance. On March 2, 1960, council, by a 7-2 vote, overrode the burgess' veto and enacted the ordinance. Thereafter, on March 5, 1960, the ordinance was advertised and, on March 11, 1960, a copy of the ordinance, maps, etc. were certified to the Court of Quarter Sessions of Montgomery County.

On April 8, 1960, three of the Township supervisors and five nearby residents of Rebel Hill filed severally two complaints: (1) one complaint asked the court to appoint a board of commissioners to take testimony in connection with the proposed annexation and (2) the other complaint attacked the legality of the ordinance.

---

[2] As portrayed to the Township the development was a $30,-000,000 project; as now portrayed, it is a $10,000,000 project.

The annexation petitioners intervened as parties in the litigation.

After a full hearing the Court of Quarter Sessions of Montgomery County on January 23, 1961 dismissed the annexation proceeding holding that the ordinance was invalid and that the proposed annexation was not in the public interest. From that order, these eight appeals have been taken.[3]

In three respects, the Borough (i.e., the Borough and other appellants) challenge the propriety of the order of the court below: (1) the complaints—filed more than 30 days after passage of the ordinance—were untimely filed; (2) the ordinance was not invalid; (3) the annexation would be in the public interest. The Township (i.e., the Township and its co-appellees) urges the contrary.

## Were the Complaints Timely Filed?

The resolution of this question depends, in the main, upon which statute governs this particular annexation proceeding, The Borough Code[4] or The Second Class Township Act of 1953.[5] It is the Borough's position that this proceeding is under The Borough Code and not the 1953 Act.[6] Under the Code, there is no specific

---

[3] The State Association of Boroughs appeared and was permitted to argue as amicus curiae.

[4] Act of May 4, 1927, P. L. 519, §§425, 426, as amended, 53 PS §§45425, 45426.

[5] Act of July 20, 1953, P. L. 550, §1 et seq., 53 PS §67501 et seq.

[6] Continuous, though erroneous, reference is made in the Borough's brief to the 1953 Act as part of The Second Class Township Code. The Act known as "the Second Class Township Code" is the Act of May 1, 1933, P. L. 103, as amended, 53 PS §65101, whereas the 1953 Act is "An Act providing for and regulating the annexation of parts of a second class township to boroughs, cities and townships" and is not part of The Second Class Township Code.

provision for an attack on an annexation ordinance but an attack on such ordinance may follow the procedure outlined for challenging any ordinance, to wit, an appeal within 30 days of the effective date of the ordinance, and, the Borough argues, since the instant complaints were not filed until April 8, 1960—37 days after March 2, 1960 when the Borough alleges this ordinance became effective—the present complaints were filed too late. However, the Township contends: (1) the instant proceedings are under the 1953 Act not The Borough Code and (2) that, even though this proceeding was under The Borough Code, the annexation ordinance, because it was not *recorded* in the ordinance book within 30 days of its passage, never became effective.

The Borough's position is clearly untenable: nothing could be more evident than that the instant proceeding is under the 1953 Act. The first paragraph of the annexation petition specifically states that the petition is presented *"in accordance with the Act of July 20, 1953, P. L. 550";* paragraph 10 states that petitioners have presented a check for $150 to the Borough to compensate the board of commissioners *"if such board be appointed under Section three of this* [1953] Act";[7] the annexation ordinance recites that the Borough approved the annexation petition, *"if the annexation of said territory shall be approved by the Court of Quarter Sessions . . ."* a requirement *only* of the 1953 Act which provides that annexation shall be effective only if the Court of Quarter Sessions enters an order affirming the annexation;[8] the Borough notified the

---

[7] There is no provision in The Borough Code for any such payment.

[8] The Borough Code provides that annexation shall become effective upon the valid enactment of an ordinance by the borough council, providing a certified copy of the ordinance be filed in the Court of Quarter Sessions and notice given to the county board of

Township of the presentation of the annexation ordinance, a requirement of the 1953 Act and not The Borough Code; paragraph 5 of the Borough's answer to the complaints admitted that notice of the annexation petition was not advertised as required by The Borough Code (§411) but it was averred "said provision has no application in the present case". Having committed itself so definitely to the annexation procedure under the 1953 Act, it is incomprehensible how the Borough can now take the position that it proceeded under another act. The Borough's hindsight cannot avail it in this instance; its commitments have been made and the 1953 Act controls the present annexation procedure.

Section 3 of the 1953 Act (53 PS §67503) provides that, if within 30 days after the Borough has certified the annexation ordinance to the court of quarter sessions, a complaint is made to that court concerning the annexation, the court, if satisfied with the legality of the proceeding and the propriety of the annexation as serving the public interests, shall appoint a board of three commissioners. In the case at bar, the Borough certified the annexation ordinance to the court on March 11, 1960, the complaints were filed on April 8, 1960, and, therefore, the complaints were timely filed.

In view of our conclusion: we need not decide whether the 1953 Act repealed by implication §§425 and 426 of The Borough Code. Having elected to follow the 1953 Act, the Borough is bound by its provisions even though not to its liking.

### Is This Annexation Ordinance Invalid?

In determining this question, we must construe several sections of The Borough Code which, in this in-

---

elections. In the instant case, notice was not given to the county board of elections until February 11, 1961, nineteen days after the Court of Quarter Sessions had entered its order refusing annexation.

stance, becomes applicable. Regardless of the annexation procedure adopted, the manner in which a municipality adopts an ordinance, the mode of recordation of such ordinance and the means whereby such ordinance becomes effective are matters determined by the Code applicable to the particular type of municipality; in the case at bar, the provisions of The Borough Code govern such matters.

The Borough Code (§1008(a), 53 PS §46008(a)) provides that no ordinance shall be considered in force until it is *recorded* in the ordinance book of the borough; that all ordinances shall, within one month after their passage, be *recorded* by the borough secretary in a book provided for that purpose; that entry of the ordinance in the ordinance book by the secretary shall be sufficient, without the signature of the president of council, burgess or other person. Furthermore, The Borough Code (§1009, 53 PS §46009) provides: "All borough records, required to be recorded or transcribed, shall be deemed valid if typewritten, printed, photostated or microfilmed . . ."

Since the Borough contends the ordinance was *recorded* March 2, 1960 and the Township contends such *recordation* did not take place until after April 5, 1960—more than 30 days after its passage—the factual background is important.

On the evening of April 5, 1960, Mr. Ross, a Township supervisor, accompanied by Mr. Quinlan, Township solicitor, visited the home of Miss Tyson, Borough Secretary. Mr. Ross testified that he was shown the ordinance book but that the annexation ordinance was not set forth therein; that Miss Tyson, at least two or three times, was asked whether the ordinance had ever been recorded in the ordinance book and she gave a negative answer; that there was only a copy of the ordinance in the "Rebel Hill file", Miss Tyson stating that the original was in the possession of Attorney Talone,

the Borough solicitor. Mr. Quinlan testified that there was a copy of the ordinance in the loose leaf folder, identified as "Rebel Hill file"; that the ordinance was not set forth in the ordinance book; that he asked Miss Tyson whether the ordinance had been recorded in the ordinance book and she replied in the negative, assigning as the reason therefor that she was waiting for Attorney Talone to return the original to her. Miss Tyson testified that the ordinance had been assigned No. 33 and that it was inserted by way of a typewritten copy on page 33 of the ordinance book.[9] Miss Tyson further testified that on March 2, 1960—after she returned home from the council meeting—she stapled a copy of the ordinance in the ordinance book and that it remained *stapled* in that book until April 5th, 1960 at which time she removed the ordinance from the book preparatory to taking it to a council meeting to be held on April 6th. There were discrepancies in Miss Tyson's testimony, particularly since on one occasion she stated that she had typed the ordinance in the ordinance book on April 6, 1960, while later she stated she had typed the ordinance on April 9, 1960. There were marks in the ordinance book indicating that something had been *stapled* to the pages.

The testimony is clear that this ordinance was not typed in the ordinance book until April 6 at the earliest, that it was not set forth in the book on the evening of April 5, 1960 and that, prior to April 5, 1960, it had been *stapled* in the book. Under such circumstances, was there a valid recordation or transcription of this ordinance in the ordinance book within the provisions of The Borough Code?

The Borough argues that *stapling* an ordinance in an ordinance book is a *recording* in the legislative sense

[9] In this connection, it should be noted that Miss Tyson later stated the number was 233, although neither the original nor the copy of the ordinance bore any number.

and that *recording* is not to be used in the narrow sense of transcription. *"Stapling"* is certainly not "type-written, printed, photostated or microfilmed".

The essential purpose behind the legislative provisions providing for recordation is that the ordinance be so entered in the ordinance book to insure a permanency of its preservation and the prevention so far as possible of its removal from the book. Whether printed, typewritten, photostated or microfilmed copies of the ordinance be affixed or attached to the pages of the book by paste, staples, clips, or otherwise, gives no assurance that the ordinance will be permanently preserved or not removed from the book. The legislature has indicated printing, typewriting, photostating or microfilming are permissible methods of recordation or transcription; it has not indicated that the *affixation* or *attachment* of ordinances so reproduced meet the legislative mandate and that *stapling* of such ordinance is to be countenanced.

The instant record graphically portrays the evil sought to be avoided by the legislature. When an examination of the Borough's ordinance book took place—34 days after passage of the ordinance—the uncontradicted evidence is that the ordinance was not in the book, having been removed, according to Miss Tyson, to take to a council meeting. Had the legislative mandate been observed, the ordinance would have been in the book in permanent form, subject to removal only by doing away with the book or the pages on which the ordinance was recorded or transcribed.

The instant ordinance was not *recorded,* in the legislative sense, within 30 days of its passage and, therefore, is invalid.

Amicus curiae argues that an ordinance of annexation is not legislative in character and, therefore, not within the orbit of §1008(a). That section provides that "No ordinance, *or* resolution of a legislative char-

acter, in the nature of an ordinance, shall be considered in force until the same is recorded in the ordinance book of the borough . . ." The wording of §1008(a) clearly reveals that the phrase "of a legislative character" is in qualification of the word "resolution" and not the word "ordinance". Were it otherwise, the qualifying phrase "in the nature of an ordinance" would qualify not only the word "resolution" but also the word "ordinance", an absurd result and contrary to the clear grammatical construction of the legislative language. *Every* ordinance, regardless of its character, is subject to the requirements of §1008 (a). *Castle Shannon Borough Annexation Case,* 160 Pa. Superior Ct. 475, 51 A. 2d 526, in no manner conflicts with our interpretation of §1008(a).

### Is This Annexation in the Public Interest?

Under the 1953 Act (§3) the appointment of a board of commissioners as a fact-finding body takes place *only* if the court of quarter sessions is satisfied with the *legality* of the annexation petition and the *"propriety"* of the annexation as serving public interests. Assuming, arguendo, the legality of this annexation proceeding, was the court below correct in finding that this annexation did not serve the public interests?

The 1953 statute does not provide for an appeal from the decision of the court of quarter sessions. Under such circumstances, our scope of review is on broad certiorari: *Bell Appeal,* 396 Pa. 592, 609, 610, 152 A. 2d 731, and cases therein cited. On broad certiorari, we "look beyond jurisdiction of the court below and regularity of the proceedings to determine, by examining the testimony, whether the findings are supported by evidence or whether the court was guilty of an abuse of discretion in such connection or an error of law": *Bell Appeal,* supra (p. 611). We do not, however,

weigh the evidence or substitute our discretion for that of the court below.

The court below, after taking extensive testimony, made certain findings: "The tract is presently undeveloped in large part and is zoned R-2 Residential under the Upper Merion Township Zoning Ordinance. Access to the area is now available only over narrow township roads, inadequate to carry any increase in traffic burden. Route 23, a state highway with a cartway width of approximately twenty feet and the railroad right of way of the Philadelphia Suburban Transportation Company skirt the southerly edge of the tract. A short distance to the east, paralleling the easterly border of the tract, is Matson Ford Road, another state highway.

"No public sewage disposal system serves the tract or the surrounding area. The nature of the terrain is such that surface drainage from the tract flows eastwardly and southerly to natural streams which are and would remain in Upper Merion Township. These streams find their way through the Borough and empty into the Schuylkill River. In its present state, the property is largely covered with trees and brush, which absorb most of the surface water.

"It is a matter of public knowledge and a part of the record of this case that the motivating force behind the annexation petition was Mr. John Trinsey and his associates, incorporated as Rebel Hill Park, Inc., hereinafter referred to as Trinsey. Trinsey proposes to erect four 'high-rise' apartment buildings, containing a total of approximately one thousand units, an office building of twenty stories, and a hotel building on part of the instant tract. In addition to normal facilities of such structures, it is proposed to include stores, restaurants, a theater, a bowling alley, and a heliport as part of this project, the goal being a 'self-contained community.'

"This project was first presented to the Board of Supervisors of Upper Merion Township. The Board declined to rezone the tract to permit such a project. Trinsey, being dissatisfied, then was instrumental in framing the petition for annexation to the Borough Council of West Conshohocken.

". . . that the township authorities have spent considerable time and public funds in planning the most appropriate use of the instant tract. Undoubtedly, the nature of the terrain, its drainage pattern, lack of public sewage facilities, absence of adequate access roads, inadequacy of existing state highways, and division of the tract by the Expressway, raise difficult planning problems. Nevertheless, the testimony is equally clear that the members of Borough Council whose affirmative votes approved the annexation petition gave next to no consideration to any of these vital problems.

. . .

"Council gave no consideration to sewage disposal from the projected 'high-rise' development, adequate police protection to the acquired area, future traffic congestion, projected cost of public sewage collection and treatment for the Borough, the proportion of this cost which the developers of the instant tract would undertake, the locations available for erection of a sewage treatment plant, the cost or location of access roads to the tract, or the cost of providing police and fire protection to the proposed development. Indeed, all that Council did consider seems to have been that existing Borough revenue of about $34,000 would be augmented by a projected increase of $168,000, if the property were developed as proposed.

. . .

"It would serve no purpose but to extend the length of this opinion to review the testimony of other Borough officials. A summary of their statements reveals that the Borough has no zoning ordinance and none is pro-

posed, that the Council was never told who owned the major portion of the tract in question, and that there is no assurance that the proposed project will be erected as planned either in part or as a unified whole.

"When we add to these considerations the peninsular nature of the area to be annexed, creating a 'panhandle' of sizeable proportions which juts into Upper Merion Township and geographically isolates lands which would remain part of that township, it becomes clear that the proposed annexation would be to the eventual benefit of neither municipality. Access to the tract, drainage from it, and even the projected location of principal sewer lines are and must remain through Upper Merion Township. Indeed, Belfont Avenue, the street forming the approximate southern boundary of the area to be annexed, would be partially in West Conshohocken and partially in the township. Following approval of annexation, access to the tract for police and fire protection would remain only over highways located in the township.

. . .

"We are also impressed by the absence of land use regulation in the Borough of West Conshohocken. Were this annexation to be approved, the Borough authorities would be powerless, except through their Building Code, to restrict the use of the tract in question. In lieu of such control, they have adopted the verbal assurances of the prospective developers, whose plans are not in final form and could be modified to suit available financing or, indeed, abandoned entirely.

"We regard the wise use of zoning regulation as the chief bulwark protecting property owners in their investment. The actual and prospective growth rate in population of this County and the consequent diminution of available vacant ground forecloses any other view. We cannot regard as proper the deliverance of a tract the size of that here in question, geographically

dominating large parts of West Conshohocken, Upper Merion Township, and Lower Merion Township, into a municipality without land use regulations.

. . .

"We are also satisfied, and so find, that the annexation will not serve the best interest of the public and is contrary to the health, safety and welfare of the public and that the disadvantages which go with the proposed annexation far outweigh any alleged advantage to the Borough or its citizens.

"When the moving force behind this annexation was refused permission by Upper Merion authorities for a change of zoning, he prevailed upon the Borough to pass the annexation ordinance over the veto of the Burgess. Neither he, nor any of the freeholders in the territory to be annexed appeared as witnesses to testify in favor of the annexation. Upper Merion Township has made an intensive study of this land over a period of years and the Borough had made no study or planning. . . .

"The proposed annexation would create substantial geographic, traffic, road and access, police and fire protection, drainage, sewerage and disposal, and zoning problems which convinces us that the proposed annexation must be denied."

We have carefully examined this record; from such examination we are fully convinced that the findings of the court below are supported by the evidence and that the court committed neither an abuse of discretion nor an error of law.

Order affirmed. Costs on John S. Trinsey, Jr., and/or the Easttown Co.

Mr. Justice MUSMANNO dissents.