Commonwealth ex rel. Harris, Appellant, *v.* Downey.

Argued March 6, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Donald D. Dolbin,* with him *Burke, Bowe, Dolbin & Heffner,* for appellant.

*Calvin J. Friedberg,* Assistant District Attorney, with him *Robert M. Harris,* District Attorney, for appellee.

*John T. Pfeiffer, III,* with him *John B. McGurl,* for trial judge.

OPINION BY WOODSIDE, J., March 22, 1961:

Delbert Harris pleaded guilty to charges of selling liquor and malt beverages on January 2, 1960, without first procuring a license, contrary to the provisions of Article 4, §491, subsection (1) and §492, subsection (2) of the Liquor Code of April 12, 1951, P. L. 90, 47 P.S. §§4-491 and 4-492.

The Liquor Code, supra, provides in §494(a) of Article 4, as amended, 47 P.S. §4-494(a), as follows: "Any person who shall violate any of the provisions of this article, except as otherwise specifically provided, shall be guilty of a misdemeanor and, upon conviction thereof, shall be sentenced to pay a fine of not less than one hundred dollars ($100), nor more than five hundred dollars ($500), and on failure to pay such fine, to imprisonment for not less than one month, nor more than three months, and for any subsequent offense, shall be sentenced to pay a fine not less than three hundred dollars ($300), nor more than five hundred dollars ($500), and to undergo imprisonment for a period not less than three months, nor more than one year."

Although this was Harris's first offense, Judge DALTON, sitting in the Court of Quarter Sessions of Schuylkill County, sentenced the defendant on September 15, 1960 as follows: "First Count—Sale of Malt beverages for consumption on premises, sold without a license—Fine of $300.00, to be paid immediately, and in default of the payment, three months in the Schuylkill County Prison. Second Count—Sale of Liquor without a License—Fine of $500.00. Imprisonment in Sch. Co. Prison for a period of one year. Payment of costs on both counts."

The illegality of the sentence was called to the judge's attention by the counsel for the prisoner and by the district attorney a few days after its imposition. Subsequently, a petition for a writ of habeas

corpus was filed, but dismissed by the Court of Common Pleas of Schuylkill County as premature because Harris had not paid the fine and costs on the second count and was then legally detained. (At that time, he had paid the fine and costs on the first count). On January 10, 1961, more than three months after the fine and costs were paid on the first count and after the expiration of the maximum jail sentence which the court could have imposed on the second count, Harris again asked for a writ of habeas corpus. A prisoner illegally detained under a sentence so obviously illegal should have been discharged forthwith, but the court after holding the petition for approximately a month, on February 6, 1961, refused to discharge the prisoner, and dismissed the petition on the ground that it did not set forth the citation of the statute authorizing the court to act upon it. After an appeal from that order was taken to this Court, and the argument advanced to March 6, Judge DALTON, upon petition of the warden of the county prison, noted that the sentence of September 15, 1960 did not "fully accord with the provision of the Liquor Code of 1951, P. L. 90, Section 404," and by order of February 28, 1961, amended the sentence imposed on the second count as follows: "Fine $500 and in default of payment three (3) months imprisonment in the Schuylkill County Prison and payment of costs."

But the prisoner was not discharged. On the Bill of Indictment charging the liquor violation appears the following: "DALTON, J., #4 February 15, 1961 (Contempt of Court Charge.) Defendant pay the costs of prosecution, pay fine of $150.00, undergo imprisonment in the Schuylkill County Prison for a period of Eight (8) Months."

This sentence was imposed in a contempt action, which kept the illegally sentenced prisoner in jail. It was a unique procedure. If at any time in the his-

tory of American Jurisprudence there was a similar action brought against a prisoner for answers made to the court at time of sentence, it has not been called to our attention, and we have no knowledge of it.

Eight days after the imposition of the illegal sentence, Judge DALTON filed a "specification of charges in re contempt of court" setting forth that the prisoner had pleaded guilty, and that "prior to passing of sentence, the defendant was interrogated in open court, by the Court," and "made answers to the questions of the Court as follows:

"(a) Defendant stated that he had come from Pittsburgh to Pottsville last November for the purpose of giving one Murray a blood transfusion.

"(b) Defendant stated that his employment in the Murray house of prostitution was solely in the capacity of a clerk at $35.00 per week in Murray's confectionary store on the first floor of said premises whereas the Liquor Laws were violated on the second floor of the said premises.

"(c) Defendant stated that prior to coming to Pottsville he was an auto mechanic in Pittsburgh and prior to that in Detroit, Michigan.

"(d) Defendant stated that he had never been associated with prostitution or crime of any kind heretofore.

"(e) Defendant stated that he was never married."

These statements, the sentencing judge charges, were false and made to mislead him. The defendant was not under oath at the time of the court's presentence interrogation.

Judge DALTON had his charges investigated, and after a hearing on October 10, 1960, "without hesitation" complimented the district attorney and his assistant for fully cooperating with the Court, and concluded "that the Commonwealth by its witnesses has

made out the case in accordance with the law." The Court did not sentence the defendant at that time, but held a second hearing on February 15, 1961, when he appointed his personal counsel to conduct the hearing instead of the district attorney. At that hearing, testimony was taken of two detectives from the Philadelphia police force who gathered the evidence against the prisoner for which he had been prosecuted.

The evidence taken at the two hearings showed as to charge "a" that the defendant had given three blood transfusions to Murray in 1957, and that he was asked to give blood again in November of 1960, and came to Pottsville and went to the hospital to give blood but other arrangements were made by Murray, and Harris, therefore, gave none.

As to charge (b) the evidence showed that Murray was offered $35 per week as a clerk in the confectionery store by Murray, but was not in the store during the three times an investigator entered it and on other occasions when the investigator passed it, and that the defendant was the bartender and sold beer and liquor on the second floor. To this the defendant pleaded guilty and received the sentences for violation of the Liquor Code referred to above.

As to charges (c) and (e) there was no evidence of marital status or that the prisoner had not been an auto mechanic in Pittsburgh and Detroit.

The investigation in Detroit showed that the defendant had paid a $17 fine for a traffic violation there in 1957. He had also paid a fine of $10 in Pennsylvania in 1960 for reckless driving. After the testimony of the fine in Detroit the Court said, "the notes of the Court show that . . . he told the Court positively that he was never before arrested or charged with any offense or violation of the law." The F.B.I. records, the Pennsylvania State Police records, the Pittsburgh police records, the Detroit police records and the

Schuylkill County police records showed no criminal record against the prisoner. One paying a fine for reckless driving is not looked upon as having a "criminal record."

As to charge (d), supra, the court took testimony of the two Philadelphia police officers who purchased the liquor which the prisoner was prosecuted for selling. They were named witnesses on the indictment charging Harris with the liquor law violation. Their testimony indicated that during the night when the liquor was purchased, two girls who had been in the room where the drinks were sold, went through a door leading to an apartment on a half a dozen different occasions with different men and returned shortly thereafter. As to one of these girls the witness testified as follows: "[Harris] told Mr. Ingram that he would be leaving the next day or the following day, and would be gone for a few days. He asked him would he take care of his girl, and he standing there about a booth away with a woman named Gaye Dawn. He asked Mr. Ingram would he take care of his girl, referring to Gaye, while he was gone, and see that she was all right as she hadn't been feeling well. He then went on to state that he had brought her in from Pittsburgh with him, and she was making out all right, but he wanted Mr. Ingram to keep an eye on her until his return." Charges of prostitution and assignation were pending against the two girls at the time of the contempt hearing.

The court filed an opinion in the contempt case in which it states: "It is apparent and uncontradicted that the defendant lied to the Court as to the blood transfusions; that he lied to the Court as to the Thirty-Five dollars a week job; that he lied to the Court as to his non-association with the prostitution business; that he lied to the Court as to his pretended enviable record of no previous violations of the law; that he

lied to the Court, as to his alleged continuous stay in Pottsville from the time of his arrival until his appearance in Court; that he lied to the Court when he gave the reason that he remained in Pottsville because of the Thirty-Five dollar a week pay he said he was receiving from Murray as a confectionery store clerk. That it constitutes an uncontradicted record of designed and malicious fabrications to mislead and to deceive the Court and to bring about the obstruction of justice. The evidence shows conclusively that the defendant lied and lied and lied to the Court for the purposes which are obvious."

These findings go beyond the charges, but that is not all. There were no stenographic notes taken at the time Harris was sentenced. During the first hearing on the contempt charges the court said he had his own notes, and said from time to time, *after* testimony was given, that such testimony was not in accord with what his notes showed was said. The court did not show his notes to the defendant or to the defendant's counsel. When the recollection of counsel for defendant and the court differed as to what Harris had said, counsel for defendant offered to call the assistant district attorney who prosecuted the case to testify what had been said by Harris at the time of sentence. Exactly what Harris said was vital to the question of its truthfulness, but *the court refused to hear the testimony.* At the close of the hearing, counsel for defendant asked if the judge's notes would be "put in evidence, or are a part of the evidence already," and was told that "They will be part of the evidence." They were *not* filed with the notes of testimony of that hearing.

At the subsequent hearing, counsel for defendant again expressed his difficulty of defending his client for contempt in making statements without any record or evidence of what the statements were. In reply to

the inquiry, "Has your Honor notes?" the court replied, "The Court has notes, and they will be made a part of this record." It was not until *after* Harris was sentenced on the contempt charge that a copy of the judge's notes were filed as a part of the record. The basis of the contempt charges was the accuracy of statements made at the time of sentence. The defendant was denied the opportunity of presenting a witness as to what he said at that time, and was denied the privilege of seeing the judge's notes or a copy of them. This alone would require setting aside the contempt sentence.

As stated by the present Chief Justice in his dissenting opinion in *Levine Contempt Case,* 372 Pa. 612, 624, 95 A. 2d 222 (1953), "For the immediate and efficient redress of a contempt committed in the presence of the court, courts generally possess the inherent power to punish summarily for it. No one will gainsay that. See Fisher v. Pace, 336 U. S. 155, 159, and Ex parte Terry, 128 U.S. 289, 313. But, just as a court's power in such respect is great, so also is its responsibility for a proper exercise of the power commensurately heavy."

We have no knowledge of any case where one being examined prior to sentence was subsequently charged with contempt for failure to accurately reply to questions submitted by the court. Even though the power to bring contempt for untruthful replies of defendants may exist under some circumstances, this innovation in the use of contempt proceedings is fraught with inherent dangers and as used here infringes upon constitutional rights.

By *Commonwealth v. Franklin,* 172 Pa. Superior Ct. 152, 193, 92 A. 2d 272 (1952), there was abolished in Pennsylvania the practice, too long followed, of holding under bond to keep the peace, defendants who had been acquitted by juries. What was said there

18

is applicable here. "Finally we may state of record that the essentially real basis for our .decision is simply that we consider the practice under review to be wrong. We are of the firm conviction that the practice is fundamentally in conflict with any modern and enlightened view of individual civil rights; that it offends the spirit and instinct, and the very letter of due process . . . Our very jurisprudence is predicated upon rule by law as distinguished from rule by man. The evil of the practice we are considering is that it is in reality an effective power to punish in virtually unrestrained form. Suppositions of right to review are in practice unrealistic. The liberties of the people are not to be committed to such despotic power— be it executive, legislative or judicial; nor are these liberties to be diluted by pretense and supposition that such virtually unreviewable power will be wielded sparingly."

The evidence in the contempt case was not sufficient to sustain a conviction of the defendant for any offense relating to prostitution, but suppose we assume that there was sufficient evidence to convict him of some offense. The defendant was never indicted for being "associated with prostitution or crime of any kind," but in this contempt proceeding he was tried for it, and he was sentenced to imprisonment without the right of having his guilt determined by a jury. Furthermore, unless the remarks of the defendant were pertinent to the issues and obstructive in effect, they would not constitute contempt, even if false. *Garabedian v. Commonwealth*, 336 Mass. 119, 142 N.E. 2d 777, 781 (1957); *In re Michael*, 326 U. S. 224, 225, 229, 66 S. Ct. 78, 90 L. Ed. 30 (1945). It was hardly relevant to a first offense of selling liquor, to determine why this 36 year old negro citizen, without any criminal record, came to Pottsville. He had a right to come and leave Pottsville as he pleased.

If a court may interrogate a defendant, pleading guilty to an offense which does not involve a jail sentence except for nonpayment of fine and costs, as to his "association with crime of any kind," and then try him without a jury and without indictment for having been "associated" with a crime, "an effective power to punish in virtually unrestrained form" is established. Such procedure is in conflict with our modern and enlightened view of individual civil rights.

We have had before us an appeal from the refusal of the court of common pleas to grant a writ of habeas corpus, a petition for us to exercise our original jurisdiction to issue a writ of habeas corpus, an appeal from the sentence on contempt, a motion to dismiss the habeas corpus appeal because the case is moot because of the order changing the sentences, a motion to dismiss the appeal from the contempt sentence because we have no jurisdiction over appeals from sentences for contempt, and a motion by the Attorney General to certify the contempt appeal to the Supreme Court.

No one, not even the court below, any longer questions the illegality of the sentence on the liquor offenses which kept the prisoner in jail unlawfully.

For the reasons set forth above we believe the prisoner is not guilty of contempt.

After the arguments in Scranton, the Attorney General petitioned this Court and received its permission to intervene. She, thereupon, through her deputy, contended in oral argument before the Court in Harrisburg that we do not have jurisdiction over an appeal from the sentence for contempt, and should certify the appeal to the Supreme Court. She acknowledged, however, that it would be permissible for this Court to grant a supersedeas on the contempt sentence, and that it would be proper to release the prisoner on bail forthwith. She also filed a brief in which she

took the same position concerning the certification and supersedeas.

We, thereupon, issued an order on March 13th reversing the court below on the appeal from its order on the writ of habeas corpus and directing that the prisoner be discharged from the sentences for the liquor offenses, he having already been imprisoned for a period longer than that provided by law.

We believe that the prisoner should be released on the contempt charge pending the determination of our jurisdiction and the ultimate outcome of the appeal. We, thereupon, issued a supersedeas directing the prisoner's discharge upon the entry of $500 bail to be approved by the president judge of the court below. The bail was ultimately approved by the court below, and the prisoner released.[1]

Prior to *Bell Appeal,* 396 Pa. 592, 152 A. 2d 731 (1959), this Court entertained jurisdiction in a number of contempt proceedings. Some of these were passed upon by the Supreme Court without questioning our jurisdiction. It appears that since *Bell Appeal,* supra, we do not have jurisdiction over a contempt action not ancillary to or connected with an action over which we have appellate jurisdiction. We are not clear concerning our jurisdiction of contempt actions which are related to and a part of those cases over which we do have appellate jurisdiction. For example, in support and custody cases, trial courts sometime make orders of contempt concerning temporary support or custody orders and appealable orders of support or custody at the same time, in the

---

[1] We are informed that as appellant was leaving the jail, warrants were served upon him charging five different crimes related to prostitution. These charges, apparently encouraged by the court below, grew out of the investigation and raid which resulted in the liquor charges for which the prisoner has already served the maximum prison term.

same case, on the same record. It would be disgracefully inefficient administration of law, and result in confusion confounded, if these two orders, made by the court in the same breath, filed to the same number, and arising out of an identical record were to be appealable to two different courts at the same time.

In the present case, the contempt action grew out of the liquor cases which were before us. It was filed to the same number as the liquor cases in the court below. The contempt sentence is written upon the same indictment which came to us as a part of the liquor cases. In this respect the contempt is so closely related to the liquor cases that it would seem that the same court should have jurisdiction of both orders.

As we stated above, we know of no case, in this or any other state, where a defendant was held in contempt for replies, courteously made while not under oath, to a judge questioning the defendant prior to sentence. We feel that this unique use of contempt proceedings should be passed upon by our highest court, and that this case should be certified to the Supreme Court under Section 10 of the Act of June 24, 1895, P. L. 212, 17 P.S. 197, even if this Court may have jurisdiction of the appeal. Because of this, *and* because of our doubts concerning our jurisdiction, we are certifying the contempt case to the Supreme Court.

We are firmly of the opinion that the prisoner should be released pending the ultimate determination of the various actions brought against him by the court below. We are, therefore, with the approval of the Attorney General, directing that the supersedeas continue in effect until action on the supersedeas is passed upon by the Supreme Court.

Habeas corpus does not lie to review contempt actions, and we must, therefore, dismiss the petition filed

requesting us to take original jurisdiction in habeas corpus and discharge the prisoner. See *In re Contempt of Myers & Brei,* 83 Pa. Superior Ct. 383 (1924).

The appeal from the sentence of contempt is certified to the Supreme Court. The appeal from the refusal of the court below to grant the writ of habeas corpus filed there has been reversed by order of March 13, and the prisoner ordered discharged. Petition to this Court to assume original jurisdiction and grant a writ of habeas corpus is refused. The order of supersedeas is to remain in effect unless and until the Supreme Court directs otherwise.

RHODES, P. J., took no part in the consideration or determination of this case.