## Commonwealth *v.* Harris, Appellant.

164

Argued April 26, 1962. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

W. J. *Woolston*, with him *Burke, Bowe, Dolbin & Heffner*, for appellant.

*Alan Miles Ruben*, Deputy Attorney General, with him *David Stahl*, Attorney General, for Commonwealth, appellee.

*Harry W. Lightstone*, District Attorney, filed a statement of position.

*John T. Pfeiffer, III*, with him *John B. McGurl*, for amici curiae.

OPINION BY MR. JUSTICE O'BRIEN, November 13, 1962:

The Superior Court certified, to this Court, the appeal from sentence of contempt imposed by Judge DALTON in the Court of Quarter Sessions of Schuylkill County, pursuant to Section 10 of the Act of June 24, 1895, P. L. 212, 17 P.S. §197.[1]

Appellant, Delbert Harris, pleaded guilty on September 15, 1960 to charges of illegally selling liquor and malt beverages on January 2, 1960, contrary to the provisions of Article 4, Section 491, Subsection (1) and

---

[1] The Act provides: "If any four of the judges of the Superior Court, whose duty it is to decide any matter coming before that court, shall certify that, in their judgment, the questions involved in any case are so difficult or important as to make it expedient that the case should be decided by the Supreme Court, the case containing such questions shall be certified to the Supreme Court for full consideration and decision, though otherwise within the exclusive jurisdiction of the Superior Court, but such certification shall not be made until after the case shall have been heard and decided, and the opinion of the court and any dissents therefrom shall have been duly filed."

Section 492, Subsection (2) of the Liquor Code of April 12, 1951, P. L. 90, 47 P.S. §§4-491 and 4-492.

The Liquor Code provides in §494(a) of Article 4, as amended, 47 P.S. §4-494(a) the following penalty: "Any person who shall violate any of the provisions of this article, except as otherwise specifically provided, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine of not less than one hundred dollars ($100.00), nor more than three hundred dollars ($300.00), and on failure to pay such fine, to imprisonment for not less than one month, nor more than three months, and for any subsequent offense, shall be sentenced to pay a fine not less than three hundred dollars ($300.00), nor more than five hundred dollars ($500.00), and to undergo imprisonment for a period not less than three months, nor more than one year."

Judge DALTON sentenced the appellant as follows: "First Count—Sale of Malt beverages for consumption on premises, sold without a license—Fine of $300.00, to be paid immediately, and in default of the payment, three months in the Schuylkill County Prison.

"Second Count—Sale of Liquor without a license— Fine of $500.00. Imprisonment in Sch. Co. Prison for a period of one year. Payment of costs on both counts."

This was the appellant's first offense and the sentence was obviously illegal. The judge's attention was called to the illegal sentence, but he did not correct it. However, eight days later the judge filed a "Specification of Charges in Re: Contempt of Court", charging that the defendant (appellant) misled him by falsely answering questions propounded by the judge at the time of sentencing. The defendant was not under oath at the time of the questioning by the judge.

The Specifications of Charges are as follows: "(a) Defendant stated that he had come from Pittsburgh to Pottsville last November for the purpose of giving one

Murray a blood transfusion. (b) Defendant stated that his employment in the Murray house of prostitution was solely in the capacity of a clerk at $35 per week in Murray's confectionary store on the first floor of said premises whereas the liquor laws were violated on the second floor of the premises. (c) Defendant stated that prior to coming to Pottsville he was an auto mechanic in Pittsburgh and prior to that in Detroit, Michigan. (d) Defendant stated that he had never been associated with prostitution or crime of any kind heretofore. (e) Defendant stated that he was never married."

After an investigation of the charges Judge DALTON held a hearing on October 10, 1960 and a second hearing on the charges on February 15, 1961. The evidence produced at the two hearings showed, with respect to charge (a), that the defendant had given blood transfusions to Murray in 1957 and defendant was asked to give blood again in November, 1959 and came to Pottsville for that purpose and went to the hospital to give blood, but Murray had made other arrangements in the meantime and defendant was not required to donate blood at the time.

Under charge (b), the evidence showed that defendant was offered $35 a week as a clerk in the confectionery store by Murray but was not in the store during the three times an investigator entered it and on other occasions when the investigator passed by the store and that the defendant was the bartender and sold beer and liquor on the second floor, for which offense he pleaded guilty and was sentenced on September 15, 1960, for the offense committed on January 2, 1960.

Under charge (c), there was no evidence that the defendant had not been an auto mechanic in Pittsburgh and Detroit.

Under charge (d), the judge took the testimony of two Philadelphia police officers, who made the liquor

purchase for which the defendant was indicted and plead guilty. This was on January 2, 1960. The testimony of the officers indicated that during the night, when the illegal sales of liquor were made, two girls who had been in the room where the drinks were sold, on numerous occasions left the room and went out a door leading to an apartment accompanied by men. The officers testified to overhearing a conversation between the defendant and a man on the premises to the effect that the defendant would be leaving Pottsville in a few days and asked the man to look after his girl as she had not been feeling well, but since he had brought her to Pottsville she had been making out all right.

Under charge (e), there was no evidence of the marital status of the defendant.

Judge DALTON said: "The notes of the court show that . . . he told the court positively that he was never before arrested or charged with any offense or violation of the law."

The investigation in Detroit showed the defendant had paid a $17 fine for a traffic violation in 1957 and he had paid a fine of $10 in Pennsylvania in 1960 for reckless driving. The F. B. I. records and the Pennsylvania State Police records and the Pittsburgh Police records and the Detroit Police records and the Schuylkill County Police records showed no criminal record against the defendant.

Immediately after the hearing on February 15, 1961 the judge found defendant guilty of contempt and sentenced him to 8 months in jail and a fine of $150. This sentence appears on the bill of indictment of the liquor violation as follows: "DALTON, J. No. 4 February 15, 1961 (Contempt of Court Charge). Defendant pay the costs of prosecution, pay fine of $150.00, undergo imprisonment in the Schuylkill County Prison for a period of Eight (8) months."

Judge WOODSIDE, speaking for the Superior Court, *Commonwealth ex rel. Harris v. Downey*, 195 Pa. Superior Ct. 8, 168 A. 2d 761 (1961), at page 21 said: "As we stated above, we know of no case, in this or any other state, where a defendant was held in contempt for replies, courteously made while not under oath, to a judge questioning the defendant prior to sentence. We feel that this unique use of contempt proceedings should be passed upon by our highest court, and that this case should be certified to the Supreme Court under Section 10 of the Act of June 24, 1895, P. L. 212, 17 P.S. 197, even if this Court may have jurisdiction of the appeal. Because of this, and because of our doubts concerning our jurisdiction, we are certifying the contempt case to the Supreme Court."

The defendant's conduct, during interrogation by the judge, prior to sentence for the liquor violation, was apparently proper, although no record was made at the time, except notes made by Judge DALTON. The gravamen of the offense, according to the judge, was "statements by the defendant were made falsely, wilfully and intentionally and with the deliberate intent and purpose to deceive the court and thereby obstruct the administration of justice". It is difficult to perceive in what manner justice was obstructed when the defendant received a sentence in excess of the maximum limit provided by the statute. Nor did the subsequent hearing on the judge's "Specification of Charges in Re Contempt of Court" substantiate the charges. The procedure of interrogating the defendant prior to sentence, preferring charges of contempt based on answers given in a respectful manner, but found to be at variance by the judge with his own unrevealed notes of defendant's answers, and then sentencing defendant for contempt of court is repugnant to the concept of impartial jurisprudence.

Punishment for contempt committed in the presence of the court is an inherently necessary right of a court for the preservation of its authority in the orderly judicial process, and the dominant purpose of punishment for this type of contempt is to vindicate the dignity and authority of the court and to protect the interest of the general public. And, as said in *Ex Parte Terry*, 128 U. S. 289, 313, such power, "although arbitrary in its nature and liable to abuse, is absolutely essential to the protection of the courts in the discharge of their functions".

Here, there is no basis for such contempt proceeding. The contempt charge and sentence must be reversed and vacated.

The Superior Court in certifying this case to us was doubtful of its jurisdiction in contempt cases. Prior to *Bell Appeal*, 396 Pa. 592, 152 A. 2d 731 (1959), as pointed out by Judge WOODSIDE in this case, *Commonwealth ex rel. Harris v. Downey*, supra, the Superior Court entertained jurisdiction in a number of contempt proceedings and as he so aptly observed, page 21, "It would be disgracefully inefficient administration of law, and result in confusion confounded, if these two orders, made by the court in the same breath, filed to the same number, and arising out of an identical record were to be appealable to two different courts at the same time". What he says is the truth and we agree, yet it is the fact as the law stands today. As was said in *Bell Appeal,* supra, page 597 et seq:

"Where appellate review of the action of a court of first instance or of an administrative tribunal is not provided for by statute or is expressly so denied, no right of appeal exists. But, even in such instance, appellate review of the proceedings below for certain purposes is obtainable in this court through an exercise of our King's Bench powers under the Act of May 22, 1722, 1 Sm. L. 131, 140, Section XIII. As stated in Carpentertown Coal & Coke Company v. Laird, 360 Pa.

94, 99, 61 A. 2d 426, the Act of 1722, supra, 'vested in the Supreme Court all the jurisdictions and powers of the three superior courts at Westminster, namely, the King's Bench, the Common Pleas and the Exchequer. Inherent in the Court of King's Bench was the power of general superintendency over inferior tribunals, a power which was of ancient inception and recognized by the common law from its very beginnings. Blackstone says, Book III, *42: "The jurisdiction of this court [of King's Bench] is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below." '

"The Superior Court derives all of its jurisdiction and powers from statute. See Duquesne City v. Fincke, 269 Pa. 112, 115, 112 A. 130; Commonwealth v. Long, 276 Pa. 154, 156, 120 A. 125; Commonwealth ex rel. v. Speer, 267 Pa. 129, 134, 110 A. 268; cf. Pittsburgh v. Pierce, 69 Pa. Superior Ct. 520, 524. Hence, no right of appellate review exists in that court in any instance except it be expressly authorized by statute. Particularly significant is the fact that the Superior Court does not possess the powers of the Court of King's Bench. See Delaware County National Bank v. Campbell, 378 Pa. 311, 316, 106 A. 2d 416; cf. also, Martonick v. Beattie, 383 Pa. 168, 171, 117 A. 2d 715. No statute confers such powers upon the Superior Court except for the purely incidental right to issue a writ of mandamus or prohibition to a court of inferior jurisdiction ancillary to proceedings pending in the Superior Court under its appellate jurisdiction, i.e., by appeal authorized by statute. See Act of May 21, 1941, P. L. 47, 17 PS §181, Pkt. Part. Even this restriction on the Superior Court's issuance of writs of mandamus and prohibition for purely ancillary use is further confirmation of the fact that the Superior Court does not possess the powers of King's Bench in general which in-

clude the power to issue common law writs of certiorari. It follows, therefore, that the Superior Court is without authority to review the work of an inferior tribunal as on certiorari where no right of appeal to that court is conferred by statute. Walker's Appeal, 294 Pa. 385, 388, 144 A. 288.''

And at page 604: ''The Rader case [*Philadelphia County Election Board v. Rader,* 162 Pa. Superior Ct. 499, 58 A. 2d 187] involved an appeal from a judgment of contempt entered by a court of common pleas against the defendant '. . . for refusing to answer questions propounded by the County Election Board of Philadelphia.' The Superior Court expressly recognized that the '. . . appeal . . ., regardless of amount involved, was not within [its] jurisdiction . . .'. Nevertheless, the court forthwith assumed jurisdiction on the basis of Section 11 of the Act of 1899, supra, saying, in that connection, that 'This defect [want of jurisdiction in the Superior Court] was called to the attention of counsel at the bar of this Court, and appellee expressly waived objection to our jurisdiction. Accordingly, we have decided the appeal.' In other words, a court, which concededly lacks jurisdiction of the subject matter, can go ahead and adjudicate the merits. The error of such a proposition is self-evident.''

And at page 605: ''The only way in which jurisdiction can properly be conferred upon the Superior Court to review the work of an inferior tribunal, where no appeal has been statutorily provided, is for the Legislature to authorize the Superior Court to entertain appeals in such cases. That is precisely what was done when the Legislature authorized an appeal to the Superior Court from an order of a court of common pleas or the County Court of Allegheny County in cases involving the suspension of a driver's license. See Section 1 of the Act of May 29, 1956, P. L. (1955) 1850, 75 PS §193, Pkt. Part. Theretofore, such cases were

reviewed by this court on certiorari. Legislation was also the competent and efficient means whereby appeals to the Superior Court were authorized from orders of the courts of quarter sessions or the County Court of Allegheny County refusing the issuance, renewals or transfers of liquor licenses (see Section 464 of the Act of April 12, 1951, P. L. 90, 47 PS §4-464) or from like court orders revoking or suspending such licenses: Section 471 of the Act of 1951, supra, 47 PS §4-471."

There are basically two types of contempt, civil and criminal, and criminal contempt is either direct or indirect, though some authorities refer to contempt of court as direct and constructive: Black's Law Dictionary, Fourth Edition. This Court said in *Knaus v. Knaus*, 387 Pa. 370, 127 A. 2d 669 (1956), page 376: "The dominant purpose of a contempt proceeding determines whether it is civil or criminal. If the dominant purpose is to vindicate the dignity and authority of the court and to protect the interest of the general public, it is a proceeding for criminal contempt. But where the act of contempt complained of is the refusal to do or refrain from doing some act ordered or prohibited primarily for the benefit of a private party, proceedings to enforce compliance with the decree of the court are civil in nature. The purpose of a civil contempt proceeding is remedial, and judicial sanctions are employed (1) to coerce the defendant into compliance with the court's order, and (2) in some instances to compensate the complainant for losses sustained: United States v. United Mine Workers of America, 330 U. S. 258, 303." See also, *Patterson v. Wyoming Valley District Council*, 31 Pa. Superior Ct. 112 (1906); *Commonwealth ex rel. Beghian v. Beghian*, 408 Pa. 408, 184 A. 2d 270 (1962).

The Superior Court has not been given jurisdiction of direct criminal contempt, no statute grants appeal,

yet the right is inherent in every court to punish for contempt committed in its presence. We have appellate jurisdiction by virtue of the powers of King's Bench in general which includes the power to issue common law writs of certiorari. Unfortunately, the Superior Court is without authority to review on certiorari where no right of appeal is conferred by a statute. *Bell Appeal,* supra, page 599: "The certiorari which the Supreme Court employs to bring up the record of a proceeding in a court of first instance, where no right of appeal is statutorily authorized or is expressly prohibited, is not to be confused with the certiorari utilized by this court and the Superior Court for the purpose of bringing up for review the record in the court below when an authorized appeal has been taken."

On the other hand Superior Court has jurisdiction in civil contempt[2] and indirect criminal contempt[3] arising in those matters within its jurisdiction and ancillary to the enforcement of orders and decrees.

The contempt action sought to be enforced herein was not of a civil or indirect criminal nature, but was treated by the court as a direct contempt[4] for defend-

---

[2] To coerce defendant into compliance with court's order and sometimes to compensate complainants for loss sustained—*Commonwealth ex rel. Litz v. Litz,* 190 Pa. Superior Ct. 310, 154 A. 2d 420 (1959); *Commonwealth ex rel. Harvey v. Harvey,* 174 Pa. Superior Ct. 425, 101 A. 2d 122 (1953); *Commonwealth ex rel. Liuzzi v. Liuzzi,* 142 Pa. Superior Ct. 239, 15 A. 2d 738 (1940); *Commonwealth ex rel. Berardino v. Berardino,* 99 Pa. Superior Ct. 537 (1930).

[3] Indirect criminal contempt to vindicate the authority of the court for acts committed outside its presence—Act of June 23, 1931, P. L. 925, §§1, 2, 17 P.S. §§2047, 2048—*Casco Products Co. v. Hess Brothers, Inc.,* 184 Pa. Superior Ct. 47, 132 A. 2d 922 (1957); and *Penn Anthracite v. Anthracite Miners,* 114 Pa. Superior Ct. 7, 174 A. 11 (1934).

[4] Direct criminal contempt—to punish for acts committed in its presence—Act of June 16, 1836, P. L. 784, §§23, 24, 17 P.S. §§2041, 2042.

ant's conduct in the presence of the court in giving answers to the court which it determined to be lies.[5]

It is true the liquor violation and the contempt proceedings were closely related. Even if the defendant had been contemptuous while before the court for sentence and was punished for it, an appeal would lie in this Court, while an appeal from the liquor violation proceeding would be to Superior Court.

This Court has sole jurisdiction in this action and in all appeals from direct contempt proceedings.

Judgment reversed and sentence vacated.

[5] Defendant was not under oath at the time of interrogation but even if he had been and if the questions were material to the inquiry any proceeding for perjury would have to be by indictment.